[Crim. No. 273.   Third Appellate District.—November 13, 1914.]

## THE PEOPLE, Respondent, v. HENRY WARNER, Appellant.

CRIMINAL LAW—BURGLARY—SUFFICIENCY OF INFORMATION—DESCRIPTION OF BUILDING.—In a prosecution for burglary, where the information alleged that the defendants "did willfully, unlawfully, feloniously and burglariously enter that certain building in the town of Guerneville, in said county, in which the United States post-office was then and there located and which building was then and there owned by Mrs. R. S. Drake, with felonious intent then and there to commit larceny," it sufficiently described the building to inform the defendant of the particular building which he was charged with having burglariously entered and to render available a plea of once in jeopardy and former conviction or acquittal in case a second prosecution for the same offense should be inaugurated against him.

ID.—CIRCUMSTANTIAL EVIDENCE—SUFFICIENCY OF.—In this prosecution for burglary it it held that while the evidence upon which the defendant was convicted was purely circumstantial, it was sufficient to support a verdict of conviction.

ID.—EVIDENCE—POSSESSION OF SMOOTH COIN—IDENTIFICATION OF—COMPARISON WITH OTHER COIN—WHEN REFUSAL TO ALLOW NOT PREJUDICIAL.—In such a case, where one of the strongest circumstances against the defendant was his possession at the time of his arrest, which occurred within a few hours after the burglary, of a smooth twenty-five cent piece, which was identified by a witness as the one which was in the rifled safe on the night of the burglary, it was not prejudicial error to refuse to permit the counsel for the defendant to show the witness another smooth twenty-five cent piece and ask him to point out the distinguishing difference, if any, between the two, as the solution of such question was one for the determination of the jury.

ID.—PRESENCE OF DEFENDANT NEAR SCENE OF CRIME IN COMPANY WITH ANOTHER.—In such a case, where the theory of the prosecution was that the crime was committed jointly by the defendant and another, it was not error to permit a witness to testify that he saw the defendant in company with the other person, who was jointly charged with him, near the scene of the crime shortly before its commission.

ID.—FINDING OF POSTAGE STAMPS NEAR SCENE OF CRIME—ERROR WITHOUT PREJUDICE.—In such a case, where it appeared that a large quantity of postage stamps, as well as money, were taken from the rifled safe, it was error to permit testimony that a witness

found two five-cent postage stamps in the early morning after the burglary on a railroad track a short distance from the town where the burglary occurred, where it was not shown that the defendant had any connection with the stamps; but such error was not prejudicial, where the other circumstances of the case, unaided by the circumstances of the finding of the stamps, were sufficient to generate in the minds of reasonable men the conviction that the defendant was, beyond a reasonable doubt, guilty of the crime charged.

ID.—IDENTIFICATION OF DEFENDANT—CONCLUSION OF ARRESTING OFFICER—WHEN REFUSAL TO STRIKE OUT NOT PREJUDICIAL.—In such a case, where the arresting officer testified that, upon going into the baggage car where the defendants were arrested, he opened the door thereof slightly and peeped through and into the passenger coach "and located the two gentlemen that I was looking for," there was no error in refusing to strike out, on motion of the defendant, the words "I was looking for," on the ground that it was equivalent to telling the jury that the defendants had committed the burglary, as the statement could not have been so understood by the jury, where the testimony of the officer showed that he had no such knowledge of the two men or their connection with the crime as would induce the jury to attach any significance to any statement by him which might be so construed as to involve a declaration or any expression of opinion by the witness that they were guilty of the charge.

ID.—POSSESSION OF "SKELETON KEY"—FAILURE TO MOVE TO STRIKE OUT.—In such a case, where the counsel for defendant, on cross-examination of the arresting officer, asked if he found any burglar's tools of any kind in possession of the accused, and the district attorney on re-direct examination asked, "You said you did not find any burglar's tools. Did you find a burglar key? A. We found a skeleton key," to which counsel for the defendant interposed: "We object to that as leading. Did he find a key?" and the witness answered "Yes, a skeleton key," and after the question had been answered counsel for defendant objected to the testimony on the ground that it was incompetent, irrelevant, and immaterial, these objections having been made after the question was answered, there was nothing before the court on which to predicate a ruling, and the remaining remedy was a motion to strike the testimony from the record; but where that was not done there is no warrant for a review by the appellate court of the error in admitting the testimony, if error it was.

APPEAL from a judgment of the Superior Court of Sonoma County. Emmett Seawell, Judge.

The facts are stated in the opinion of the court.

T. J. Butts, and Charles Peery, for Appellant.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

HART, J.—The defendant and one Joe Malone were jointly charged by an information filed in the superior court of Sonoma County with the crime of burglary. The accused demanded and were given separate trials and the defendant was convicted of the crime charged.

This appeal, supported by a transcript of the testimony duly prepared under section 1247 of the Penal Code, is presented by the defendant from the judgment.

The first point made by the defendant is that the building in which the burglary is alleged to have been committed is not so described in the information as to identify it with that definiteness necessary to the protection of the accused against a second prosecution for the identical offense which it was the intention to charge.

The information alleges that the defendants "did willfully, unlawfully, feloniously and burglariously enter that certain building in the town of Guerneville, in said county, in which the United States post-office was then and there located and which building was then and there owned by Mrs. R. S. Drake, with felonious intent then and there to commit larceny."

We think the building was thus so described in the information as to have fully informed the defendant of the particular building which he was charged with having burglariously entered and to render available a plea of once in jeopardy and former conviction or acquittal in case a second prosecution for the same offense should be inaugurated against him. Indeed, the statement that the building entered was the one in which the United States post-office at Guerneville is located would have been a sufficient description, since there is but one post-office in said town. But the description goes further by declaring that said building was owned by Mrs. R. S. Drake. The evidence confirms this allegation and further shows that the post-office was in the building owned by her. The description was clearly sufficient for all purposes. (See *People* v. *Edwards,* 59 Cal. 359; *People* v. *Bitancourt,* 74 Cal. 188, 190, [15 Pac. 744]; *People* v. *Main,* 114 Cal. 634, [46 Pac. 612]; *People* v. *Parker,* 91 Cal. 91, [27 Pac. 537]; *People* v. *Price,* 143 Cal. 351, [77 Pac. 73].)

The next point urged for a reversal is that the evidence is insufficient to support the verdict.

The evidence upon which the defendant was convicted was purely circumstantial, and, while it is to be conceded that it does not appear at first blush to be very strong, still, after a careful analysis of the circumstances thus developed, we are persuaded that the conclusion reached by the jury is well supported.

The facts, narratively stated, are as follows: Between the hours of 5:35 P. M. of the twentieth and 5:25 A. M. of the twenty-first day of May, 1913, the post-office at Guerneville was entered, the safe therein blown open by dynamite and its contents rifled, there having been taken therefrom $171.07 in cash and $1,151.75 in postage stamps. The money so taken consisted of two or three twenty-dollar pieces, a considerable lot of five-dollar pieces and a quantity of dimes and nickels. Among this money was a quarter of a dollar which had worn perfectly smooth and which had been in the possession of the postmaster for several weeks prior and up to the time of the burglary.

An inspection of the post-office premises early on the morning of May 21st, after the postmaster had discovered that the office had been burglarized, revealed the fact that the door of the building had been pried open by means of picks, which had been taken from the toolhouse of the railroad company. The safe was badly shattered from the effect of the concussion. In the post-office there were picked up from the floor something over eleven dollars in money, which had evidently been dropped by the burglars, perhaps because of their haste in getting away from the scene of their crime.

It appears that the defendant and Malone, his codefendant, were first seen in the neighborhood of Guerneville on the eighteenth day of May, 1913—two or three days previously to the commission of the crime. On that day they ate dinner at a hotel at Occidental, a small town situated several miles from Guerneville. By various persons they were thereafter seen either at Guerneville or at points near that town both before and on the day that the building was entered. On the morning of the twentieth day of May, at about the hour of 10 o'clock, they were seen lying under a tree on the roadside near a place called Rio Nido, which place is located about a mile from Guerneville. At 12 o'clock noon of the twentieth

day of May they were seen sitting in front of one of the places of business at Guerneville about a block distant from the post-office. At about fifteen minutes to 6 o'clock of the morning of the twenty-first day of May, the defendant and his companion appeared at the hotel at Occidental and there and at that time had breakfast. At about 6:40 A. M., the conductor on a narrow-gauge railroad whose trains carry passengers from Occidental to Sausalito, where the road connects with the boats for San Francisco, saw the defendant and Malone, just as the train was about to move, running from behind the depot at Occidental to catch said train. The two men boarded the train without having first purchased tickets at the depot, paying their fares to Camp Meeker, a station on the line of said road a short distance from Occidental, to the conductor. When the train reached Camp Meeker, both men alighted, one going down the track in the direction in which the train was then going. The other went in the opposite direction. The train remained at Camp Meeker for upwards of thirty-five minutes and then resumed its journey south. Both the defendant and Malone had boarded the train, the former having purchased a ticket to Fairfax and the latter a ticket to Pacheco, a small flag station, at which, the conductor testified, the train rarely ever stopped or had occasion to stop. On entering the passenger coach, the defendant took the rear seat and Malone a seat in the front part of the car, and thus they traveled until Fairfax was reached. It appears that, the sheriff's office of Marin County having previously been apprised of the burglary by the authorities of Sonoma County, a deputy sheriff of the first named county boarded the train before it arrived at Fairfax, he having been given information that two persons who were suspected of having perpetrated the crime were aboard of said train. The deputy took a position in the baggage car and, peeping "through the crack of the door," saw the two men seated in the passenger coach, as above indicated. When the train reached the Fairfax depot, the officer, having stepped into the passenger coach just before the train came to a standstill, followed the two men out of the car. Before they got off the car, the defendant, in a whisper, but so that the officer heard it, directed Malone to walk down the track. As Malone started down the track, the defendant started toward the town. Before either had taken many steps in the respective directions in which

they had started, the officer halted and proceeded to question them, asking them their names, where they came from, etc. The defendant gave his name as Lawson and at a subsequent interview with the two men Malone declared that his name was Murray. "I asked them," testified the officer, "where they boarded the train—I asked the gentleman (the defendant) where he boarded the train and he would not answer me. I asked him the second time, and he pulled a card out of his pocket—that is, a time table—and was looking over the time table. He seemed to be quite nervous. Well, he was nervous. He would not answer me at all. I asked him the second time. I says, 'How far are you going?' He says, 'I am going to San Francisco.' I says, 'What made you get off here?' He says, 'You tell me something and I will tell you something'— that is the remark he made. He did not tell me why he got off at Fairfax. . . . That train runs through to connect with the boat for San Francisco—it runs to Sausalito, which is a transfer station to San Francisco." The officer then placed the two men under arrest and conveyed them to the sheriff's office at San Rafael. There the two men were searched, and from the person of the defendant the sum of $78.70 was taken, and upon that of Malone the sum of $78.60 was found. Among the pieces of coin found on the defendant was a quarter of a dollar which had become perfectly smooth. No postage stamps were found in the possession of either of the two men.

Thus we have detailed all the circumstances disclosed by the evidence purporting to fasten guilt upon the defendant and upon which the jury founded their verdict of conviction.

Readily it will be observed that the strongest circumstance developed at the trial against the defendant was the fact of his possession, at the time of his arrest, which occurred within a few hours after the burglary, of the smooth two-bit piece referred to above. Mr. Duncan, the postmaster, having been shown the smooth two-bit piece taken from the defendant, testified, upon an examination of the coin, that it "was the two-bit piece that was in the safe the night of the robbery, after I locked it up. I received it from Mr. Johnson that runs the mercantile store there. He brought it in one morning and asked me if I thought it was good for stamps. I was in a hurry and told him I thought it was." He said that he placed the quarter in the post-office receipts till, where he

left the stamp money, but that, because it was "so slick," he took occasion to examine it several times while it was in his possession. He observed on the coin a little depression below the right side of the eagle, and from that mark, which was perhaps made in the milling of the piece, he felt satisfied that the coin taken from the defendant was the same smooth two-bit piece which he received from Johnson and which was in the post-office safe on the night of the robbery.

C. D. Johnson, from whom the postmaster received, under the circumstances as explained by the latter, a smooth twenty-five cent piece, testified, in part, as follows: "Q. Mr. Johnson, I show you a quarter marked people's Exhibit I for identification, *People* v. *Warner.* Did you ever see that quarter before? A. Yes. Q. When did you first see that? A. Oh, after the 1st of September a year ago . . . in the safe of the Guerneville Rochdale Company. (The witness was connected with said company.) . . . It remained in the safe in a little box until along about January and I took it out. There were four quarters. I took the four of them out and put them in my pocket. . . . Two of them I still have. . . . This particular quarter I gave when I went to the post-office. I asked Mr. Duncan (the postmaster) if he would take it for stamps. This occurred in February or March, perhaps February (1913). . . . I had it in my pocket over a month or six weeks. . . . I took the four quarters out (of the safe). Two of the quarters were marked. . . . Two of the coins had no mark on them. . . . This is the coin I turned over to the postmaster for postage stamps." The witness proceeded to testify that, after the robbery of the post-office, the quarter taken from the defendant's possession at the time of his arrest was exhibited to him (witness) by the sheriff of Sonoma County, and that he identified the coin as the one delivered by him to the postmaster. He said he was able to identify the coin from the fact that on its date side it was perfectly smooth, the date and the "Goddess of Liberty" being wholly obliterated, and from the further fact that on the reverse side thereof the eagle, while considerably worn, was plainly visible and that to the right and under the eagle there was a peculiar depression.

The defendant did not take the stand in his own behalf. One Robert Wall, however, testifying for him, said that he was engaged in the business of selling newspapers at a news

stand at the ferry building, in San Francisco; that he was acquainted with the defendant, who had, during the recent Portola festival in San Francisco, worked for the witness; that, on the seventeenth day of May, 1913—about four days prior to the time of the commission of the crime charged—the defendant bought a newspaper from him and in payment therefor handed the witness a five-dollar gold piece; that he (witness) in returning to the defendant the change, gave the latter, among other denominations of coin, a quarter of a dollar which had been so worn that it was perfectly smooth. The witness inspected and examined the quarter taken from the defendant and declared that he was "pretty sure that was the quarter that I gave him at that time."

Thus it is to be noted that a conflict arises in the evidence upon the question whether the "smooth quarter" found in the possession of the accused at the time of his arrest was the one which the postmaster declared was in the safe of the post-office. While it may be conceded that the identification of a particular piece of coin is, as a general proposition, an act most difficult of accomplishment, still, in this case, it is made to appear that the particular coin whose identification was singularly vital to the determination of the ultimate issue was so peculiarly marked that in that respect it was plainly different and so removed from the ordinary coins of its denomination that the witnesses for the people, having frequently examined it, could identify it as one which they had seen and handled previously to the time at which it was found in the possession of the accused. It was, therefore, with no less propriety than as to any other question of fact in the case, with the jury to decide the truth of the controversy and so determine whether the identification of the coin by the witnesses, Duncan and Johnson, was to be accepted as correct or erroneous or of so doubtful a character as to justify its rejection. The jury evidently accredited the identification of the coin by said witnesses, and thus the fact of the possession by the defendant, so soon after the burglary, of the twenty-five cent piece in question became and constituted a circumstance which, unexplained, although not of itself sufficient to warrant a conviction, the jury were nevertheless authorized to consider, in connection with the other circumstances, such as they were, in passing upon the question of the guilt or innocence of the accused. And, whether the circumstance of

the possession of stolen property has been satisfactorily explained, is a question solely for the jury's determination.

The case, then, as to the facts, stands thus: That the defendant and his companion, Malone, strangers in and around the town of Guerneville, were engaged in loitering about that and neighboring places for several days before and on the day of or preceding that on which the burglary was committed; that neither of the men appeared to have any special business, at least of a legitimate nature, in that locality; that, early of the morning of the twenty-first day of May, and within a few hours after the burglary, they, at the town of Occidental, were seen running from behind the depot to catch a train which was about to start; that they boarded said train, without first procuring tickets, paid their fares to the conductor to Camp Meeker, a short distance from Occidental, and then alighted and departed, one going in one direction and the other in the opposite; that they again took that train and occupied seats in the coach far apart from each other, going to Fairfax, where they alighted, the defendant directing his companion to walk on down the track, while he himself started in an opposite direction and toward the business part of said town; that, upon being accosted by the officer and questioned by him as to their names, where they came from, and where they were going, the defendant betrayed nervousness, refused to answer the officer's questions as to the point at which they boarded the train and where they had been, and both gave the officer fictitious names; that the two men each had in his possession approximately the same amount of money, and that in the defendant's possession was a piece of coin which was identified as the one in the safe at the time that it was rifled.

That the circumstances as thus recapitulated strongly point to the defendant's guilt, no reasonable person will for a moment deny or even attempt to controvert. And, while the defendant was at liberty to remain mute at the trial and his silence not to be considered against him, yet the fact conspicuously stands out that none of those circumstances was controverted or its incriminatory force impeached or impaired by adversary testimony, except the single circumstance (as to which, as seen, there is no conflict in the testimony) of the finding in the possession of the defendant of a two-bit piece which corresponded in certain respects, unusual to coin, with

a piece of money of the same denomination which was shown to have been in the post-office safe at the time of the burglary. In the absence of satisfactory or any explanation of those circumstances, the jury were required to answer for themselves, by a consideration of all the circumstances together, these questions: 1. Why did the defendant and his companion conceal themselves behind the depot at Occidental, at an early hour in the morning, and then hastily take the train, as it was about to move, without first providing themselves with tickets in the usual way? 2. Why did they separate when arriving at Camp Meeker and alighting from the train and then again take the same train for Fairfax? 3. Why did they separate themselves in the coach, one taking a seat in the extreme rear of the coach and the other seating himself in the extreme forward end of the car? 4. Why, upon reaching Fairfax, did the defendant request Malone to walk on down the track and he start to go toward the business part of the town? 5. Why did they give assumed or false names to the deputy sheriff? 6. Why, if, as the defendant declared was true, they were bound for San Francisco, did they leave at Fairfax the train on which they were riding and which would have given them direct connection with the ferry boats at Sausalito for San Francisco? 7. Why did they refuse to answer the deputy sheriff when he questioned them as to the place at which they boarded the train and as to where they had been? 8. What was the occasion of the betrayal of nervousness by the defendant when first accosted and questioned by the officer? 9. What was the purpose of the two men in loitering around the neighborhood of Guerneville? Men traveling together as companions may, with perfectly righteous motives, act as the defendant and Malone acted, yet such conduct in men who, as friends, are journeying together over the country is so peculiar and unusual or so far the reverse of the ordinary demeanor of men traveling together that it is open to very serious suspicion that there is some sinister or questionable motive behind it, and when viewed by the light of other connected circumstances tending in some measure to fasten guilt of crime upon persons so demeaning themselves, it may well be expected to lead the mind from the grade of mere suspicion to that of conviction that it is actuated by a criminal purpose. And so the jury could with sound reason have viewed and presumptively did view the

actions of the defendant and his companion as thus shown by the testimony, and, as before declared, we cannot see how a court of review can justly say that their interpretation of all the circumstances, considered together and in connection with each other, as represented by their verdict is, as a matter of law, erroneous.

It is next contended that numerous prejudicial errors were committed in rulings upon the evidence. Some of these will be noticed.

Counsel for the defendant, having first shown to the witness, Duncan, another smooth quarter of a dollar than the one found on the defendant, asked him to point out the distinguishing difference, if any, between the two pieces of coin. The obvious purpose of such examination of the witness was to show, if thus it could be done, that there was nothing in the coin taken from the defendant which would enable a person to distinguish it from any other equally smooth two-bit piece. The court interrupted counsel to say that, as far as he could·go in the matter of testing the ability of the witness to identify the coin in question, was to question, by proper cross-examination, the means or method whereby he assumed to be able to identify or distinguish said coin from any other like coin. The court's course in this regard is assigned as error.

While we think that the court could, without serious legal impropriety, have allowed the witness to compare the two pieces of coin and point out or, as counsel for the defendant undoubtedly expected would be the result, fail to point out, any difference between the two that would facilitate a ready distinction between them, it is clear that, strictly speaking, the ruling was not erroneous, for, after all, the question whether the two-bit piece the identification of which was of vital importance in this case was or was not in any respect different from any other smooth quarter of a dollar was one whose solution was for the jury and not for the witness. As a matter of defense, it would have been proper and competent for counsel for the defendant to have put in evidence another or other quarters of the same general appearance as that of the one taken from the defendant and thus have submitted to the determination of the jury the proposition whether the piece of coin found on the defendant could by any means or for any reason be differentiated or distinguished from the

ordinary coin of like denomination, worn smooth by use. This course counsel did not adopt.

It is urged that, inasmuch as there was presented no direct evidence of the commission of the burglary by more than one person, it was error for the court to permit a witness to testify that he saw the defendant in the company of Malone at the Monte Rio Hotel on the afternoon of May 20th. The theory of the prosecution was that the crime was committed jointly by the defendant and Malone, and upon that theory the testimony objected to was peculiarly pertinent. But even if the prosecution had proceeded upon the theory that the defendant alone committed the deed, testimony of the fact that, just prior to the burglary, he had been seen near the scene thereof in the company of another party, who was not accused or even suspected of complicity in the commission of the crime, could not possibly prejudice his rights.

It appears that, at about 6 o'clock of the morning of the twenty-first day of May, one Lincoln Stewart, while on his way to his place of employment, found two five-cent postage stamps on the railroad track between Guerneville and Monte Rio, and a short distance from the former place, and over objection by defendant, Stewart was permitted to testify to the fact of finding said stamps, and objection was also likewise but unavailingly made to the admission of the stamps in evidence. The defendant was not shown to have had any connection with said stamps, and therefore, the testimony disclosing the fact that they were found as indicated could have no tendency to establish his guilt. We can conceive of no legal reason justifying the admission of the testimony. We are of the opinion, however, that the other circumstances were, unaided by the circumstance of the finding of the stamps, amply sufficient to generate in the minds of reasonable men the conviction that the defendant was, beyond a reasonable doubt, guilty of the crime charged. In other words, we are convinced that had the circumstance of the finding of the stamps been eliminated from or not brought into the record, the jury could have justly concluded from the other circumstances that the defendant was guilty. In this view of the record, the testimony objected to cannot well be held to have operated prejudicially against the accused.

The witness, Emerald, the deputy sheriff who arrested the defendant and Malone, testified that, upon going into the bag-

gage-car, he opened the door thereof slightly, peeped through
and into the passenger coach and ''located the two gentlemen
that I was looking for.'' Counsel for the defendant moved to
strike out the words, ''I was looking for,'' contending that
the statement of the witness as phrased by the latter ''was
equivalent to telling the jury that the defendant and the other
man, Malone, had committed the robbery at Guerneville.''
The court refused to order said words stricken out. The state-
ment could not have been so understood by the jury, since
the testimony of the officer did not show that he had such
knowledge of the two men or their connection with the crime
as would induce the jury to attach any significance to any
statement by him which might be so construed as to involve
a declaration or the expression of an opinion by him that they
were guilty of the charge. His testimony clearly disclosed
that all that he knew about the defendant and Malone or
their connection with the commission of the crime for which
he arrested them was what he might have acquired through
his interpretation of their actions or conduct when he placed
them under arrest, and it is only reasonable to say that in-
telligent men would not, in the face of such testimony, pay
any attention to what might be viewed, by possible construc-
tion, as an opinion of the witness that the accused were the
guilty persons.

It is complained that the ruling permitting the deputy
sheriff who arrested the defendant to testify that he found,
among other articles, a ''skeleton key'' in the possession of
the latter, when arrested, was erroneous and prejudicial. It
may perhaps be unnecessary to explain that a ''skeleton key''
is a burglar's implement and is commonly known to be habit-
ually carried by professional burglars, it being capable of
opening door locks to which it had not been specially fitted. .
The specific objection to this testimony is, however, that, in-
asmuch as it was quite clearly shown that entrance into the
building was effected by the prying open of the door by means
of a pick and not by the use of a key, the fact that the de-
fendant had upon his person a skeleton or burglar's key could
have no pertinency to any issue in the case. But it appears
that counsel for the defendant first opened up the matter
objected to by asking the witness, on cross-examination, if
he found any burglar's tools of any kind in the possession
of the accused. On re-direct, the following question was asked

by the district attorney: "You said you did not find any burg-
lar's tools. Did you find a burglar key? A. We found a
skeleton key." Counsel for the defendant then interposed:
"We object to that as leading. Did he find a key?" Answer,
by witness: "Yes, a skeleton key." Subsequently, and after
the question had been answered, counsel for the defendant
objected to the testimony upon the ground that it was "in-
competent, irrelevant and immaterial." These objections
having been made after the question was answered, there was
nothing before the court upon which to predicate a ruling
and, therefore, no ruling was made. Counsel's remaining
remedy was in a motion to strike the testimony from the
record, and having failed to make such a motion, there is no
warrant for a review by this court of the error in admitting
the testimony, if error it was.

We have now considered herein all the assignments of error
in the rulings of the court upon the evidence that we have
thought merited special notice. We can see no just reason
for interference with the jury's conclusion upon the ultimate
question in this case, and the judgment is, therefore, affirmed.

Chipman, P. J., and Burnett, J., concurred.