[Crim. No. 1355.   Third Appellate District.—May 22, .1934.]

THE PEOPLE, Respondent, v. C. G. PARKINSON, Appellant.

S. Luke Howe and O. F. Meldon for Appellant.

U. S. Webb, Attorney-General, and Jess Hession, Deputy Attorney-General, for Respondent.

PLUMMER, J.—On the twenty-first day of November, 1933, an information was filed in the Superior Court of the County of Sacramento, charging the appellant, together with Frank Crawshaw and F. E. Collins, with the crime of burglary, alleged to have been committed in the city and county of Sacramento, on or about the eleventh day of October, 1933, in that the said defendants did enter the office of the Rainier Distributing Company, located in a building situate at 1808 Twenty-second Street, in the city and county of Sacramento. To this information the defendants Crawshaw and Collins, during the course of the trial subsequently had thereon, entered pleas of guilty. The appellant was found guilty of burglary in the second degree, and from the judgment pronounced upon the verdict rendered against him, and from the order of the court denying his motion for a new trial, this appeal is prosecuted.

Two questions are submitted for our consideration: 1st: That the evidence is insufficient to support the verdict; and 2d: That the court erred in denying the appellant's motion for a new trial.

The record shows that the Rainier Distributing Company had an office at 1808 Twenty-second Street, and in the

office there was a safe belonging to the company. On the evening of October 10, 1933, the managers of the company left the office at about 7:30 o'clock in the evening; that the safe in the office which we have mentioned contained some $800 in currency and checks, and also other papers not necessary to be mentioned here. The office had one door leading out into another portion of the building. When the managers left the office of the company they locked the safe, and also the door which we have mentioned. When one of the managers returned to the office on the morning of October 11th, he found the safe open; the dial that controlled the combination was knocked off; papers were on the floor; money and checks were gone. At about 1 o'clock on the morning of October 11th, two police officers, one named Catlett and the other Kenealy, were patroling the district in the vicinity of 1808 Twenty-second Street, and saw two men who were about one-half a block from the Rainier Distributing Company's office. The officers stopped the two men; made inquiries as to how they happened to be there, and where they were going; to which the men replied that they had just got off of a freight train and were on their way to the lower end of town. It so happened that they were traveling in a direction other than that toward the lower end of town. Thereupon, the officers proceeded to search the defendants Crawshaw and Collins. In this search they found considerable money in the pockets of one of the defendants, and money in the cap of another of the defendants. They also found a number of checks; also, a flashlight was found in the pocket of one of the defendants, and two 12-gauge shotgun shells, loaded with No. 2 shots. The defendants Crawshaw and Collins were sent to the police station at approximately 1:30 o'clock; thereafter, at approximately 3 o'clock, a telephone call was received at the police station, inquiring about Crawshaw and Collins. The person making the inquiry represented himself as Luke Howe. The officers proceeded to check the telephone call, found the number of the place from which the call had been sent in, and thereupon proceeded to Sixth and I Streets, and there arrested the defendant Parkinson and a man by the name of Richie. When questioned at first about the telephone call Parkinson said that it was a joke. After taking Parkinson and Richie to the police station the officers

went back to Sixth and I Streets, arriving there shortly after 3 o'clock, and found a yellow roadster registered in the name of Parkinson. In this car the police officers found the following articles: sawed-off shotgun, No. 12 gauge; a 30–30 rifle, loaded; a sledge-hammer; a bar; 7 punches; chisel; rope; and a pair of gloves similar to the ones found on the persons of both Crawshaw and Collins.

In making the entrance to the Rainier Distributing Company office it appears that the skylight was opened and a rope was lowered therefrom. This rope was left hanging where it had been used in making the entrance to the building. Near the safe where the dial to the combination was broken off was found a piece of a chisel. The piece of the chisel found near the safe fitted into the place where the chisel found in the appellant's car had been broken, showing that the chisel found in Parkinson's car had been used in breaking the combination of the Rainier Distributing Company's safe. At the police station there was taken from the person of the appellant, a key described by some of the witnesses as a skeleton or pass-key, and by other witnesses, as a common key which was shown by experiments to lock and unlock the door to the office of the Rainier Distributing Company.

The record shows that in addition to the property which we have described as taken from the persons of Crawshaw and Collins, there was taken from the person of Collins a key, a knife and a cheap watch. Experiments made after the close of the trial in this action showed that this key would also unlock and lock the door to the Rainier Distributing Company's office. The articles which we have mentioned as found in the car belonging to the appellant were contained in a gunnysack.

There is also testimony in the record to the effect that the arresting officers repeatedly asked the appellant about his phone call, and how he knew the two men were arrested, and that the appellant refused to answer; that he simply kept his mouth shut and said nothing; and that he did not tell them that he was phoning for somebody else. Also, at the time that the appellant and Richie were being locked up, the appellant was overheard to say to Richie, "Don't talk; keep your mouth shut."

In addition to what we have stated as taken from the persons of Crawshaw and Collins, it appears that two loaded shotgun shells No. 12 gauge were taken from the clothing of one of them.

On behalf of the appellant testimony was introduced to the effect that on the evening of October 10, 1933, he went to a place kept by Mr. and Mrs. Wirts at Eighteenth and X Streets, had dinner there, and remained until about 12 o'clock, when the appellant and Mr. and Mrs. Wirts drove to the north part of the city and stopped at what is called in the record "Richie's Place"; that they were drinking at the Wirts' place, and when they went over to Richie's place they also had several drinks; that they all left the Richie place around about twenty or thirty minutes after 2 A. M.; that they drove from the Richie place down to Sixth and I Streets, and stopped at a speakeasy called the "Green Lantern"; that the appellant and Richie went up there and had a few drinks, the appellant then testifying that he was called out and asked for the loan of his car. The appellant had testified that his car was left parked in the north part of the city near the subway, from early in the evening until the time that he and Mr. Richie left Richie's place and drove down to the Green Lantern. Just how the appellant's car happened to be parked at Richie's place in the north part of the city, and the appellant had in the evening gone over to a place located in the southern part of the city, is not explained in the record.

The appellant testified that at the Green Lantern he was called out by a man by the name of Bill Crumb, and asked for the loan of his car, which was then parked in front of the Green Lantern on Sixth and I Streets, as just stated; that he had known him in and out of town for five or six years, but had not seen him for considerable time before being called out from the Green Lantern, as just stated. The testimony of the appellant shows further that the appellant had had no conversation with the so-called person named Bill Crumb; that there had been no appointment, and how Bill Crumb happened to come to the Green Lantern is left entirely unexplained.

While the record shows that the witnesses Richie and Mrs. Wirts were at the Green Lantern at the time when

the appellant claims to have loaned the car to Bill Crumb, neither one of these witnesses saw the person called "Bill Crumb". The appellant likewise testified, not that he did not own the articles found in his car, as claimed in the briefs, but that he first learned that these things were in his car when he was told by Mr. Foote, the next morning after his arrest. The testimony of the appellant with regard to meeting Bill Crumb is as follows: "Q. And did you have an appointment to meet him at the Green Lantern? A. I did not. Q. And he came up there and asked for you? A. Yes. Q. And you were there, were you? A. Yes, I was there. Q. You were there, you and Richie? A. Yes, sir. Q. What were you doing in the Green Lantern at that time in the morning? A. Drinking."

Richie's testimony, after testifying that he went from his place to the Green Lantern, is as follows: "Q. Was Mr. Parkinson with you there at all the time from the time you arrived until the officers— A. Right with me? Q. Yes, at the Green Lantern. Was he there in the building? A. He was there in the · building, yes. Q. The only time he was away was when he stepped in to the telephone—the room with the telephone? A. I don't know where he went. Q. But he went into the room? A. Yes. Q. Do you know about what time it was you went to the Green Lantern? A. A little after 2 o'clock."

Upon cross-examination it appears that this witness had formerly testified as follows, about the appellant going to Richie's place: "Q. What time did Tuffy come out? ('Tuffy' was the name given to Parkinson.) A. One or one thirty. Q. In his roadster? A. Yes."

Mrs. Wirts testified, as we have stated, that Parkinson, Mr. Wirts and herself drove from the Wirts' place in the southern part of the city over to Richie's place in a car belonging to a friend. Who the friend was does not appear in the record. Mrs. Wirts testified that she and Wirts also drove down to the Green Lantern; that they did not have any appointment to meet Parkinson and Richie at the Green Lantern; that they were at the Green Lantern around 2:30 A. M.; that she did not know the exact time that they went into the Green Lantern. Questioned as to whether she saw Parkinson at the Green Lantern, the record shows the following: "Q. Did you see Tuffy there? (Re-

ferring to the appellant.) A. No. Q. Was his car out in front? A. Yes. Q. Did you see his car in front of the Green Lantern when you went in? A. When we went into the Green Lantern. Q. How long did you stay in the Green Lantern? A. Oh, about half an hour, I think. Q. And when you saw his car in front of the Green Lantern, did you look for him, inquire for him in the Green Lantern? A. No. Q. When you came out was the car there? A. No.''

Upon the trial of the case the police officer Catlett testified as follows: ''Q. Now, did you stop these men and talk with them? (Referring to Crawshaw and Collins.) A. We did. Q. What time was it? A. Approximately ten minutes to one. Q. In the morning? A. In the morning. Q. Did you search them? A. I did; I searched Collins first. Q. Now, did you find any keys in the possession of either Crawshaw or Collins? A. No, sir. Q. No keys on either one? A. No, sir.''

The police officer Kenealy testified as follows: ''Q. Now, in order to shorten this case I might just ask you if you heard Mr. Catlett testifying? A. I did. Q. To the arrest of the two defendants and the attendant circumstances? A. I did. Q. Would your testimony be the same? A. Practically the same.''

As we have stated, the record shows that when the defendant Collins was arrested there was taken from his person a key which would lock and unlock the office door of the Rainier Distributing Company. The copies of receipts presented upon motion for new trial show that the officers had taken receipts for the identical property referred to herein, and show that they had taken from the person of Collins a key which would fit the office door of the Rainier Distributing Company just as above stated. This fact appears to have escaped the recollection of the officers upon testifying in this case. In his address to the jury counsel for the People, referring to the fact that a key found upon the person of Parkinson would lock and unlock the office door of the Rainier Distributing Company, used the following language: ''Well, who was the third man that was with Crawshaw and Collins? Who was the man that used the gloves that were found in Parkinson's car by the driver's seat? Now, if Crumb had gone down to get the tools,

wouldn't the tools and gloves have all been together? And how would the key get into Parkinson's possession? And that is the thing, the key to the whole situation in this case: The key was just a little too much. That is one of the things that you can't explain, and they could argue until Doomsday, and how could they explain it? And I want you to pay particular attention to that, because it is not only the door key, but it is the key to this whole case, the thing that ties up the defendant Parkinson, in the case so completely that there is absolutely and positively no doubt; and that is this, as I said, and I say again,—and you will pardon me for repeating it, but it is that important that I feel that I ought to repeat it again,—and that is that that door was closed there and Parkinson had the key that turned the lock on the door, that not only locked it but unlocked it, and Crawshaw and Collins did not have a key, and how did Crawshaw and Collins get in there? They got in there with the key Parkinson had, and if Parkinson didn't use the key to open the door that led in there, how did the key get back into Parkinson's pocket? And if Crumb had borrowed the car to go get the tools, how did the key—why was the key found in Parkinson's pocket? Now, if you can answer that, turn him loose. If you can answer that, find him not guilty. If I was defending that man before this court, and that evidence came in, I couldn't answer it.''

The discovery, after the trial of the Parkinson case, that a key taken from the person of Collins would answer the same purpose as the key found upon the person of the appellant is the real basis for the motion for new trial herein.

Excluding reference to the key found upon the person of the appellant, the first question to be answered is: Is the testimony shown by the record sufficient to support the verdict? In addition to what we have said, the testimony shows that the appellant and Crawshaw and Collins were acquainted with each other, but were not shown to have been together on the evening of the burglary. ▆ In principle the testimony as to the possession of burglarious tools we think comes within the doctrine relating to the possession of stolen property shortly after the commission of an offense. That testimony as to the possession of such

instruments may be admitted in evidence after the fact of a burglary having been committed, seems to be very clearly established by the authorities cited in the footnotes to sections 131 and 132, 9 C. J., on pages 1073, 1074 and 1075.

In the instant case the record presents more than the mere possession of tools suitable for the accomplishment of a burglary. In addition to the loaded rifle, the shotgun, the sledge-hammer and numerous punches, the record shows that there was found in the automobile belonging to the appellant a certain chisel from the point of which a portion had been broken. The broken portion of the chisel was found near the safe that had been burglarized. This broken portion is shown by the record to exactly fit the broken place in the chisel. The explanation given by the appellant as to his possession of the different articles found in the gunnysack in the rear of his automobile is not such as to carry any weight whatever. "The phantom" Mr. Crumb was never seen by any of the other persons at the Green Lantern on the morning of October 11, 1933, nor had the so-called Mr. Crumb been seen by the appellant, according to his own testimony, for several days preceding his visit to the Green Lantern. The appellant, according to his own testimony, had no appointment to meet Mr. Crumb at the Green Lantern in the early hours of the morning of October 11th. Nothing in the record shows that the so-called Mr. Crumb knew that the appellant was at the Green Lantern; nothing in the record shows that the appellant and the so-called "Bill Crumb" had ever met each other, or were accustomed to meet each other at the Green Lantern; the record shows no effort on the part of the appellant to have the so-called "Bill Crumb" apprehended or subpoenaed to testify in this case.

The testimony of Mrs. Wirts is that she and Mr. Wirts and the appellant drove from the Wirts place in the southern part of the city to the Richie place in a car belonging to a friend. The name of the friend does not appear in the record. The witness Richie contradicts this portion of the appellant's alibi, and states that the appellant drove to his place in his own yellow roadster. The appellant testified that his roadster was parked in front of the Richie place early in the evening at about the same time that the

testimony shows the appellant reached the home of the Wirts in the southern part of the city. The witness Mrs. Wirts testified that when she and Mr. Wirts went to the Green Lantern after leaving the Richie place, she did not see the appellant there; that she did see the car in front of the Green Lantern, upon going to the place, and after remaining there some thirty minutes, left, and when she left the Green Lantern observed that the yellow roadster was gone. Somewhere in the neighborhood of 3 o'clock on the morning of October 11th the appellant telephoned, using an assumed name, to ascertain if Crawshaw and Collins had been arrested. No information had been given out by the police department as to the arrest of Crawshaw and Collins. No telephone messages had gone out from the police department, and no other calls or inquiries as to Crawshaw and Collins had been made. When questioned as to the telephone message, the appellant replied to one inquiry that it was only a joke. As to other repeated inquiries as to how he obtained the information which caused him to telephone to the police office, the appellant made no reply whatever. The fact that the appellant, before any information had been given out by the police department of the arrest of Crawshaw and Collins, sent in the telephone call, establishes beyond controversy that he knew what was taking place. The mute evidence of the chisel with the broken end being found in the possession of the appellant, to which the broken end thereof found near the safe fitted exactly, is as conclusive a circumstance as can well be conceived of supporting the conclusion that the chisel found in the possession of the appellant was the chisel used in breaking the combination of the burglarized safe. The explanation given by the appellant of his possession of the chisel as well as of the other articles, as we have said, is not such as to command either the belief or conviction of anyone either as to its reasonableness or as to its truth. In fact, we think the jury would be justified, and could only be justified in coming to the conclusion that the appellant's story in relation to the appearance of Bill Crumb asking for the loan of the automobile at such an unusual hour, without any information as to the whereabouts of the appellant at the time in question, was and is a transparent fabrication and establishes beyond a reasonable doubt that

the appellant was not only the possessor of the chisel in question, but also was one of the parties who participated in its use in opening the safe belonging to the Rainier Distributing Company. Likewise, the inference to be drawn from the telephone message following shortly after the arrest of Crawshaw and Collins, may properly be drawn that the appellant was in the neighborhood where the burglary was committed and witnessed the apprehension of Crawshaw and Collins by the officers, as we have above related.

While the evidence of the possession of stolen goods, and we may add, of burglarious tools, shortly after the commission of an offense may not, standing alone, be sufficient to sustain a verdict, it requires only slight additional testimony. In the case of *People* v. *Lang*, 142 Cal. 482 [76 Pac. 232], the evidence is summarized in the third paragraph of the opinion as follows, and held to be sufficient, to wit: "There is evidence which, if true (and we must presume it to be true for the purposes of this case), shows that on the morning of August 6th, the defendant took the overcoat to a loan office at 22 Mason Street and pawned it for $4.00; that he signed a fictitious name on the books at the loan office, to-wit, 'G. Reed, 1101 Eddy Street'; that the overcoat is the property of Orr; that it was found at the loan office by detectives Dinan and Wren; that the name, 'G. Reed, 1101 Eddy Street', written in the books of the loan office, is the handwriting of defendant, and that defendant when arrested denied that he pawned the overcoat." The opinion then goes on to state: "The authorities hold that where goods have been feloniously taken by means of a burglary, and they are immediately or soon thereafter found in the possession of a person who gives a false account, or refuses to give any account, of the manner in which he came into the possession, proof of such possession and guilty conduct is presumptive evidence not only that he stole the goods, but that he made use of the means by which access to them was obtained." The jury in the instant case were amply justified in coming to the conclusion that the appellant gave a false account of the loan of his automobile to the person we have called "phantom Bill Crumb". Likewise, the record shows that he refused to give any account of how or why he was caused to telephone to ask if Crawshaw and Collins had been arrested.

In the case of *People* v. *Wing*, 23 Cal. App. 50 [137 Pac. 47, 48], the facts and the holding of the court are set forth in the opinion as follows: "A certain business concern was burglarized in San Francisco on the night of July 8, 1912. In September of the same year a detective of the Police Department, while investigating another charge against the defendant, found in his possession the articles stolen on the night of July 8th. Defendant admitted that he received these goods on July 18th, but at the trial claimed that he had purchased them from a man named Dewey. The articles admitted in evidence against the defendant were amply identified as those which were stolen on July 8th from the said concern, and as defendant came into possession of them ten days later, the fact of having possession of recently stolen property was clearly before the jury. Dewey, the man from whom the defendant claimed to have purchased this property, was not satisfactorily identified, nor was he called as a witness by the defendant. Moreover, a witness for the People testified that the defendant had told him that he had bought the goods in Fresno a year before and defendant was also contradicted in his testimony that on the night of the commission of the crime he was in the city of Stockton." This testimony was held to be sufficient to support the verdict of conviction. The person of Bill Crumb in this case fits in very closely with the person called Dewey in the case from which we have just quoted. Neither person is satisfactorily accounted for. The jury in both cases were authorized to conclude that the alleged persons were only fictitious.

In the case of *People* v. *Warner*, 25 Cal. App. 751 [145 Pac. 545], this court had occasion to pass upon a conviction based upon the possession of stolen property, supported by other circumstances, to sustain a conviction. It was there held that the possession of a certain coin which had been worn smooth, found in the possession of the defendant, identified as being the property of the one from whom it had been stolen, together with the incriminating actions of the defendant, constituted sufficient proof upon which to base a verdict of guilty.

In the case of *People* v. *Morrell*, 28 Cal. App. 729 [153 Pac. 977], it was held that proof of the possession of stolen property shortly after a burglary had been committed, ac-

companied by a false account, or a refusal to give an account of the manner in which possession was obtained, constituted sufficient proof to support a verdict.

That proof of the possession of burglarious tools is admissible in testimony is supported by the case of *People* v. *Winters,* 29 Cal. 658.

The foregoing summary of what the record shows in this case we think amply supports the conclusion that the verdict of the jury was and is fully supported.

█ It remains to be determined whether the trial court abused its discretion in refusing to grant the appellant's motion for a new trial. The lapse of the memory of the two officers who searched Crawshaw and Collins, relative to their not finding a key on the person of either of said defendants, is not explained in any affidavits contained in the record. That the key found in the possession of the appellant was such as would lock and unlock the door of the office in which the burglarized safe was contained, must be admitted as a circumstance of considerable importance. There is nothing in the affidavit, however, to the effect that this particular key was not used. The affidavit of Collins as to the possession of the key heretofore referred to herein, and which, upon trial being made, was found sufficient to lock and unlock the same door, contains no statement as to whether the key possessed by him was or was not used. All that appears in the record is that Collins pleaded guilty as being one of the persons who participated in the burglary. There is no statement in his affidavit concerning the use of the broken chisel, nor is there anything in the affidavit which explains how the implements referred to herein were found in the appellant's automobile. For all that appears in the affidavit it may be that the key possessed by the appellant was actually used in opening the office door of the Rainier Distributing Company. The argument of counsel for the People in stressing the importance of the key is a circumstance which should have, and probably did appeal strongly to the jury, and must have been a circumstance taken into consideration by the judge of the trial court when passing upon the appellant's motion for a new trial.

Again, there is another factor which must be considered, and which doubtless was considered by the trial court in

passing upon the appellant's motion, to wit: The diligence or lack of diligence in discovering the different articles taken from the persons of the three defendants. The record shows that all the articles which we have mentioned were taken from the persons of the defendants on the eleventh day of October, 1933. These different articles were in the possession either of the property officers of the police department of the city of Sacramento, or in the possession of the jailor of the county of Sacramento, from the time that they were taken from the persons of the defendants until the time of the trial. Access thereto might have been had by counsel for the appellant at any reasonable time. The fact that the appellant had a key, of course, was known to him. The fact that one of the other defendants had a key could have been readily discovered by an examination of the record showing the property taken from him. The affidavit of Collins is to the effect that he made known the possession of the key to counsel for the appellant immediately after the trial. The fact that the two officers who searched Crawshaw and Collins testified that they did not find any keys upon the person of either of them does not excuse the failure to examine the records to which we have referred, which were open to inspection from the eleventh day of October, 1933, until the date of trial on January 17, 1934.

The law in relation to granting a new trial and the binding effect of the discretion of the trial court is fully set forth in 8 California Jurisprudence, page 442, section 463, as follows: "A motion for new trial is addressed to the sound legal discretion of the trial court, and its action will not be disturbed upon appeal except in an instance manifesting a clear and unmistakable abuse of such discretion. This rule is peculiarly applicable to an application based upon the ground of newly discovered evidence, as to which an enlarged discretion is committed to the trial court, because of the disfavor with which such applications have always been regarded. This discretion is to be exercised in determining the diligence shown, the truth of the matters stated, and the materiality and probability of the effect of them if believed to be true. The question as to whether the evidence produced on the motion is such as to render a different result probable is one peculiarly addressed to the discretion of the trial judge." This statement of the law

is so fully supported by the cases cited in the footnotes, that no further reference need be made thereto. We may, however, quote the following from the case of *Nave* v. *Graham*, 37 Cal. App. 332 [174 Pac. 76] : "An adverse ruling on such a motion and on such grounds (newly discovered evidence), will not be disturbed on appeal in the absence of a plain showing of abuse of the power of the court. The question as to whether diligence had been used which might have enabled the moving party to have furnished the evidence at the trial, and whether a different result would be probable had such evidence been produced, were matters which the court had discretion to determine either way under the statements made in the affidavits." (Citing authorities.) The trial court possessed the power to determine whether there would have been a different result had the fact of the possession of the key by Collins (which key would also unlock and lock the office door of the Rainier Distributing Company), been placed, or not been placed before the jury. The trial court also had before it the determination of the question whether there would have been a different result if a new trial were granted.

In view of the conclusion which we have reached that the evidence is sufficient to support. a verdict of guilty, without any reference to the key possessed by the appellant, it follows that we cannot hold the trial judge guilty of an abuse of discretion in denying his motion for a new trial on the ground of newly discovered evidence. Nor can it be held that the record shows a miscarriage of justice.

The judgment and order are affirmed.

Thompson, J., and Pullen, P. J., concurred.