78 P.2d 1112

**STATE v. ROMERO.**

No. 4355.

Supreme Court of New Mexico.

April 23, 1938.

Ove E. Overson, of Hot Springs, and Nils T. Kjellstrom, of Gallup, for appellant.

Frank H. Patton, Atty. Gen., and Richard E. Manson, Asst. Atty. Gen., for the State.

HUDSPETH, Chief Justice.

The defendant was convicted of murder in the second degree and appeals. The sole question for review is the alleged error in overruling the motion for new trial on the ground of newly discovered evidence.

On the 24th of October, 1936, Ella Mae Shreave, wife of Robert L. Shreave, was killed at a log cabin in Mills Canyon, Socorro county. Her skull was fractured in two places, throat cut, her shoulder gashed, and her body bruised in several places. The body was dragged from a door of the cabin to a pit about 75 feet from the cabin and covered with stones, where it was found the following day. The head was bloody, but the clothing found on the body was not blood stained.

The area is sparsely settled, the nearest habitation to the scene of the homicide being some two and one-half miles distant. About the first of October the defendant and Mr. and Mrs. Shreave left Hot Springs, N. Mex., for the mountains on a partnership business venture—the gathering of pinon nuts. Shreave sold a sawmill before starting for the mountains—and defendant had knowledge of this fact. The cabin in which the crime was committed had two small rooms. Shreave and his wife slept in one room and the defendant in the other. All took their meals together, which were cooked in a fireplace in Shreave's room. On the evening of the 23d of October Shreave discussed with his wife and the defendant a trip to the town of Magdalena, twelve miles away, to be made the following day. Mrs. Shreave at first planned to accompany her husband, but finally decided to remain at the cabin. The defendant started the day's work on the 24th cleaning pinon nuts in a shed forming part of the cabin. Up to this point there is no material conflict in the testimony.

Shreave testified that on the morning of the 24th of October he left the cabin for Magdalena about 8:30 or 9:00 o'clock; that at the time of his departure the defendant was cleaning pinon nuts in the shed and Mrs. Shreave was in the house; that he returned about 3:30 p. m. and drove up to the cabin and got out of his car; that the defendant was standing near the front of the car, and after he and the defendant exchanged a few friendly words the defendant, without warning, struck him on the body; that he was greatly surprised and backed off, defending himself as best he could, and finally saw that defendant had a knife and was stabbing him; that he turned and ran to the

camp of the hunters near the well; that defendant stabbed him in the back as he ran away and shot at him after he arrived at the hunters' camp. The hunters took him to Magdalena for medical aid and from there he was sent to a hospital in Albuquerque, where he remained nine days; that he had on October 24th more than $100 on his person; and that he had given defendant money.

The deer hunting season opened on the 25th of October in the year 1936, and, as is the custom, hunters went into the deer country and established camps the day before the opening in order to be able to reach the hunting ground in the early morning of the first day of the season.

Jack Wedgewood and another hunter approached the cabin, the scene of the tragedy, about 1:00 o'clock on October 24th. The defendant was standing by the tank at the well 150 yards from the cabin. The defendant was rubbing his hands and working them around and around. His conduct was such that he aroused the suspicion of the hunters. When they informed defendant that they intended to camp there, he replied that the cabin was occupied and that there was another cabin three or four miles above. They went to the place recommended by defendant, found it too high for deer hunting, and returned to the scene of the homicide, and again found the defendant standing by the tank. When they told defendant that they would camp near the cabin and use the shed for storing their provisions in the event of rain, the defendant replied that they could not use the shed since he was using it in cleaning pinons. He then told them that three or four hundred yards down the canyon and around the bend there was a good place to camp, and a cave in which they could put their provisions in case of rain. They went in search of the cave, but found none and returned to a point near the well and made camp. They were later joined by other members of their party.

The Wedgewood party of hunters saw Shreave return to the cabin in his car about 3:30 in the afternoon and corroborated Shreave as to the happenings upon his arrival. One testified:

"Well, he drove up to the house and in about two or three minutes after he got there I heard some one hollering and I looked up that way and they were both (interruption) I could tell it was Bob Shreave. * * * he came down to the camp. * * *

"Q. Where was the defendant at that time? A. Well, he was at the house then after he got through chasing Bob. * * *"

Dr. Lane and Jim Neely, hunters of Albuquerque, were camped some miles away. About 7:00 o'clock, after dark, the defendant appeared at their camp. When he approached the campfire he said the fire was a lifesaver and asked the doctor if he and his companion were officers. He offered them a drink out of a bottle, which he said contained whisky, and when they declined he pulled a large caliber pistol out of the pocket of his mackinaw and said that he could make them drink. He also said that the reason he was drinking was that he had

lost his wife and that he had her clothing in the back of the car. He said he was lost and asked to be directed to Hot Springs, and when they gave him the directions by the main-traveled highway which leads through Magdalena and Socorro, he said he did not want to go that way.

At the time of the defendant's arrest in Hot Springs on October 25th he was wearing striped bib-overalls. He pulled these off and left them at home. Some time later when the officers called for the clothing which the defendant was wearing on his arrival at home, the bib-overalls and other wearing apparel was turned over to them by defendant's wife. They had been laundered and the washerwoman testified that there was a spot on the overalls which looked like blood stain. As to the happenings at the time of the arrest, the sheriff testified: "Mr. Romero took a pistol off of his body, threw it on the bed, and he reached back and got a rifle and he threw it on the bed, and he reached down in his pocket and pulled out a knife and he threw that down on the bed. I asked him was that the knife he had at the time of this happening and he said yes. * * *" Jack Martin testified that he was looking for the defendant, who was sometimes known as Albert Romero, during the evening of the 24th of October, and visited the scene of the homicide. He said: "We went up to look for a fellow known to us as Albert Romero, but when we got there it was almost dark and I went in the house and there had been a fire recently built in the fireplace. That fire was built of burlap sacks and debris, and on top

was fresh pinon sticks, and on those sacks was blood."

The defendant testified that after working for a while in the shed cleaning pinons on the morning of the 24th of October, he departed for the pinon grove to pick pinons, about 8:00 o'clock, leaving Mr. and Mrs. Shreave in the cabin; that he saw no other person around the house; that he was away on this work six or seven hours, returning to the cabin about 2:00 p. m., when he found no one at the cabin, and decided that Mrs. Shreave had changed her mind and accompanied her husband to Magdalena; that he put on the striped bib-overalls and his mackinaw coat and went to the windmill for water; that near the windmill he met two deer hunters in a car, who expressed a desire to camp in the cabin; that he told them that the cabin was occupied; that there was another cabin up the canyon; that after the hunters returned and put up their tent near the cabin he went up over the mesa and started picking pinons and returned between 4:00 and 4:30 p. m., when he found that Shreave had returned and was standing near his car at the cabin; that defendant went into the cabin for the purpose of preparing the evening meal when he missed the sacks of pinon nuts gathered by the partners, which had been stored in one of the rooms of the cabin; that he went out of the cabin and a dispute arose between him and Shreave over the pinon nuts; that Shreave drew a pistol and that he stabbed Shreave in self-defense, and on cross-examination he admitted that in the excitement he might have stabbed him in the back as he ran away

toward the camp of the hunters near the windmill; that after Shreave arrived at the camp he fired a shot over the tent of the hunters to frighten them so that they would not interfere with him; that it was getting dusk when he departed in Shreave's car, taking Shreave's gun and pistol, and after traveling some distance on an old road he saw a campfire and stopped and inquired of two men, identified as Dr. Lane and Jim Neely, the general direction to Hot Springs; that he offered them a drink of whisky, but denied threatening them with his pistol or making the statement testified to by Dr. Lane and Jim Neely to the effect that he had lost his wife and had her clothing in the car; that after departing from Dr. Lane's camp he lost his way, stopped by the side of the road and slept in the car during the night of October 24th, and arrived in Hot Springs about 2:00 p. m. the next day; that he left the car some six blocks from his home because the engine was hot; that he intended to surrender for the stabbing of Shreave—that he did not know of the death of Mrs. Shreave—but the sheriff came to his house and his wife admitted him about 6:00 o'clock before he had communicated with the officers; that he turned over to the sheriff Shreave's pistol and rifle and his own pocketknife.

The defendant's motion for a new trial is based upon the affidavit of Bernardo Lopez, which reads as follows:

"I, Bernardo Lopez, being first duly sworn, upon oath, deposes and says: that I am over the age of Twenty One Years and make the following statement free and voluntary and as the true facts as follows:

"When I came out of the camp I met Mr. Romero gathering some pinions west from my camp and I asked him where there were any pinions on the hill and that he had found three rats nests and got a ten pound bucket of pinions I asked him if I could get some rat nests I am going below to see if I can find some rat nests then I went up the hill and I was just a little farther up I could see a car standing in front of the house a log house a peculiar car with a green box when I was digging out some pinion nuts from a rats nest I heard a woman scream about three times then I went back to the camp and I took my meal and I didn't go out of the camp again I met Romero between 9 and 10 o'clock and he was about a half a mile from the cabin I had seen this car before and it belonged to the husband of the woman who was killed. I saw it when I went for water to the windmill. My camp was a little over a half mile from the log cabin. This was on a Saturday that this happened. It was around the 24 or 25 of October 1936 The day after this I heard this woman had been killed As I remember it it was raining on the day she was killed. I was in jail when Shreave was there He said he would give me 50 dollars if I would testify in his favor. That I couldn't be a witness for him because I didn't know anything about Mr. Romero I said Shreave said he had $100 in his pocket."

The Attorney General contends that the proposed new evidence fails to meet the

requirements necessary to obtain a new trial upon the ground of newly discovered evidence under the rule set forth in State v. Luttrell, 28 N.M. 393, 212 P. 739, in several respects. He argues that the testimony of Bernardo Lopez would not change the result if a new trial is granted. We have carefully read all the testimony and set out herein a rather full synopsis of it in order that the point ably presented by counsel might be viewed, from the standpoint of the learned trial judge, as nearly as may be. The defendant and his counsel in the motion for a new trial state that the facts set forth in the affidavit of Bernardo Lopez were not discovered until the 3d of April, 1937, after the trial of this cause; that Lopez did not reveal, discuss, or disclose his knowledge of the facts set forth in his affidavit to any person until after the trial, which closed on March 26, 1937. This failure on the part of Lopez to disclose the facts tends to discredit his statement. He failed to mention his knowledge of the occurrence for five months, notwithstanding the fact that he was for a time an inmate of a small jail in which the defendant had been incarcerated after the crime was committed.

According to the defendant's own testimony he changed his clothes in the shambles after returning to the cabin at 2 p. m. Instead of inviting the hunters to view the scene of the homicide and the blood-soaked sacks, his efforts were directed to keeping them away from the cabin. Moreover, his remark to Dr. Lane to the effect that he had lost his wife and had her clothing in the car, made probably while the defendant was under the influence of liquor, was not explained, and it is suggested that the death of Mrs. Shreave was preying upon his mind. His attempt to kill Shreave upon his arrival from Magdalena, and before Shreave had entered the cabin, according to the state's theory, is strong evidence that the defendant was endeavoring to remove the one witness who would certainly expose his infamy. Not one of the state's witnesses was a close friend of Shreave. Most of them were rank strangers to both Shreave and the defendant. The hunters were in the camp near the windmill when Shreave returned from Magdalena and corroborated his testimony as to the attack made on him by the defendant immediately after his arrival at the cabin. According to defendant's own testimony he was the only person in the cabin after his second return in the afternoon, and he must have put the bloody sacks on the fire discovered by the witness Martin about dark on the evening of the 24th.

The defendant testified that he saw no one about the cabin except Mr. and Mrs. Shreave on the morning of the 24th. The meeting place of Lopez and the defendant, it is averred in the affidavit, was about a half mile from the cabin. If this was "about the cabin" the affidavit contradicts the defendant's own testimony, and in any event if there was a meeting between defendant and Bernardo Lopez, as stated in the affidavit, on the morning of the 24th of October before Mrs. Shreave was killed, the defendant had knowledge of it and the record not

only fails to show due diligence on his part, but fails to show any effort whatsoever on the part of the defendant, who is an intelligent man, during the five months which elapsed between the arrest of the defendant and the trial, to obtain the testimony of Bernardo Lopez. No excuse was offered for such failure. The defendant and Lopez had been in and out of the same small jail during the time and it is not shown that they did not meet in that jail. It appears that under the authorities due diligence was not shown. State v. Blancett, 24 N.M. 433, 174 P. 207; State v. Graves, 21 N.M. 556, 157 P. 160; State v. Gonzales, 19 N.M. 467, 144 P. 1144; State v. Padilla, 18 N.M. 573, 139 P. 143; Donahue v. State, 38 Okl.Cr. 87, 259 P. 179; Dorety v. State, 44 Ga.App. 775, 162 S.E. 878; Smith v. State, 23 Ala.App. 488, 128 So. 358; People v. Harrison, 359 Ill. 295, 194 N.E. 518.

 Appellant cites Devine v. Wells, 300 Mo. 177, 254 S.W. 65, 67, where the general rule is clearly stated: "Applications for new trial on the ground of newly discovered evidence are not viewed with favor, are not to be encouraged, and ought to be examined with caution. Cook v. Railroad, 56 Mo. [380], loc. cit. 382; Mayor of Liberty v. Burns, 114 Mo. [426], loc. cit. 432, 433, 19 S.W. 1107, 21 S.W. 728. This rule guides the trial court in ruling on the motion, and has its place in the review of that ruling. The settled general rule is that the trial court's exercise of discretion in refusing or sustaining motions for new trial will not be disturbed unless a manifest abuse of that discretion is made to appear." In State v. Houston, 33 N.M. 259, 263 P. 754, 757, we recognized, as did the Missouri court in the Devine Case, that the function of passing upon motions for new trial on newly discovered evidence belongs naturally and peculiarly, although not exclusively, to the trial court. We said in State v. Houston, supra: "Another rule which bears upon the discretion of the court in considering the motion for a new trial on the ground of newly discovered evidence is the sufficiency of the trial evidence." In our opinion the evidence was ample to justify the verdict in the case at bar; in fact, the state made out a strong case against the defendant. The burden of showing that the newly discovered evidence would probably bring about a different result is on the defendant. State v. Goldberger, 118 Conn. 444, 173 A. 216. The trial court and able counsel saw to it that he had a trial free from error. The motion for new trial is addressed to the sound legal discretion of the trial court, and will not be disturbed upon appeal except where there is a clear and unmistakable abuse of such discretion. Some courts hold that where the motion is based upon grounds of newly discovered evidence there is an enlarged discretion committed to the trial court because of the disfavor with which such applications have been regarded. "This discretion is to be exercised in determining the diligence shown, the truth of the matters stated, and the materiality and probability of the effect of them if believed to be true. The question as to whether the evidence produced on the motion is such as to render a different result probable is one peculiarly addressed to the

discretion of the trial judge." People v. Parkinson, 138 Cal.App. 599, 33 P.2d 18, 24. Lopez' story sounds inherently improbable. In view of these circumstances, we cannot say that the testimony of Lopez is of such a nature as would probably produce a different result if a new trial was had, or that the trial court abused its discretion in denying the motion.

For the reasons stated the judgment and sentence of the district court should be affirmed, and it is so ordered.

SADLER, BICKLEY, and BRICE, JJ., concur.

ZINN, J., did not participate.