THE STATE OF CONNECTICUT *vs.* HARRY GOLDBERGER.
HARRY GOLDBERGER *vs.* THE STATE OF CONNECTICUT.

MALTBIE, C. J., HAINES, HINMAN, BANKS AND AVERY, JS.

Argued April 4th—decided June 5th, 1934.

*Henry Greenstein,* with whom were *Zalmon S. Hirsch* and *Sydney P. Simons,* for the appellant (the accused).

*Lorin W. Willis,* Assistant State's Attorney, with whom, on the brief, was *William H. Comley,* State's Attorney, for the appellee (the State).

AVERY, J. The accused was brought to trial in the Criminal Superior Court in Fairfield County on an indictment charging murder in the second degree; and, after a plea of not guilty, was tried to the jury, and a verdict of guilty of murder in the second degree was rendered by the jury. From the judgment and verdict the accused appealed, alleging error in the action of the trial court in denying the accused's motion to set aside the verdict, and also in certain rulings upon evidence. After the judgment, the accused brought a petition for a new trial upon the ground of newly-discovered evidence. It was heard by the court and judgment entered denying the petition, from which the accused has appealed. To avoid unnecessary repetition, the two cases may best be considered together.

Upon the trial of the indictment to the jury, the State offered evidence from which the jury might reasonably have found these facts: On Sunday, November 20th, 1932, the accused, in company with his brother, Michael, drove in a Ford runabout from his home, 3321 Main Street, Bridgeport, to 441 Water

Street in that city, where, with his three brothers, he conducted a wholesale produce business. He arrived there at about 8.15 a. m. and parked his car in the street in front of the store. Michael Gintoli conducted a grocery business in a building owned by the accused next door to the Goldberger establishment on Water Street. A few minutes after nine o'clock, the accused went into the store of Gintoli and asked permission to take the latter's truck. This was a Dodge three-quarter ton delivery truck with a panel body, without doors in the rear, and had upon its side yellow lettering upon a blue background, and carried the name "M. Gintoli," and in script, underneath, the words "Italian Groceries." It was at that time parked on the west curbline of Water Street in front of Gintoli's store, facing north. The accused, with the consent of Gintoli, took the automobile and was seen to drive north along Water Street. Some time between 9.30 and 9.35 a. m., the deceased, Kalman Goldberger, as had been his custom for a number of Sunday mornings prior, was walking north on Beechmont Avenue in the direction of the home of Carl Knecht, a former bookkeeper in his business, living at 69 Quarry Street, which runs easterly from Beechmont Avenue, some distance beyond its intersection with North Main Street. This is a little more than two miles from Gintoli's place of business on Water Street in a general northerly direction. At about 9.35, the truck was being driven rapidly north on Beechmont Avenue, having turned into that street from Main Street. At that time, the deceased was walking in a northerly direction a short distance south of Quarry Street. There was no sidewalk, only a cinder path, on the east side of Beechmont Avenue at that point, and he was walking close to the east curb on the highway which was paved with warranite, thirty-

two feet wide from curb to curb. The automobile truck, as it approached the deceased, turned in to the right, striking him and throwing his body into the air. It then turned back into the highway and, without diminishing speed, proceeded northerly to Thorme Street.

At the northwest corner of Beechmont Avenue and Thorme Street, there is a combination police station and fire engine house; the latter situated on the corner and the police station in the rear of the building, facing Thorme Street. At the time that Kalman Goldberger was struck, there was in the highway nearby a seven year old boy, Kenneth Hawks, who saw the entire occurrence. Bernard J. McKelvey, an adult, lived at 199 Beechmont Avenue, almost directly opposite. He was proceeding from his garage in the rear of his house toward the street and heard the noise of the automobile striking some object, and arrived in time to see the cap and shoes of the deceased still in the air, and the deceased lying in the gutter on the east side of the highway with his head upon the curb. The morning was clear, the sun was shining brightly and the pavement dry. There were no other automobiles on the street at the time. Near the body in the roadway were a number of pieces of glass. Neither witness was able to see the features of the driver, and though McKelvey shouted to him, he did not stop. They saw the car turn from Beechmont Avenue into Thorme Street, and before it disappeared from sight, the driver was seen to turn and look back to where the deceased lay in the roadway. McKelvey subsequently identified the Gintoli truck as the automobile which struck the deceased.

Between nine-thirty and nine-forty-five that morning, Lieutenant of Police George F. Benedetti was on duty in the Fourth Precinct Station on Thorme Street,

and was sitting at the window at the right of the entrance. He noticed a truck, which he subsequently identified as that of Gintoli, stop a short distance west of the entrance about five or six feet from the northerly curb of Thorme Street, and watched it back toward Beechmont Avenue. Between nine-forty-five and ten o'clock on the same morning, two men riding in an automobile westerly on East Washington Avenue, while stopping for a traffic light at the intersection of that avenue and Housatonic Avenue, saw the truck of Gintoli proceeding southerly on Housatonic Avenue at a fast rate of speed. Both witnesses identified the truck and one of them was acquainted with the accused and recognized him as the driver thereof, and observed that he was the only person in it. This intersection of Housatonic and East Washington Avenues is about one mile north of the Goldberger place of business on Water Street and slightly more than a mile south of the place where Kalman Goldberger was killed. At approximately ten o'clock Gintoli saw the accused return the truck and park it in front of his place of business. Shortly thereafter, the attention of Gintoli was called to the fact that the right front headlight of his car was broken and his right front fender was bent. When the truck was loaned to the accused, the headlight was in good condition and there were no dents or breaks in the fender. Upon seeing the condition of the truck, Gintoli walked into the Goldberger store and demanded to know of the accused, in the presence of his brother Michael, what had happened to the truck, and was told by the accused to have it fixed and that he would pay the bills, and to stop his noise. The pieces of glass picked up on Beechmont Avenue, near the place where the deceased was killed, were found to fit with the remaining pieces of glass in the headlight of the car.

Later in the day, about noon, the accused was arrested and interrogated by Lieutenant Benedetti at the police station on Thorme Street. He first denied that he had used Gintoli's truck at all that day but within a few moments admitted that he had borrowed it about nine o'clock that morning but claimed that he had only gone to the freight yard near his place of business, and had returned it in about five minutes to Gintoli. The watchman at the freight yard did not see the accused there with the truck between nine and ten o'clock but did see him on foot there some time between eleven and eleven-thirty that day. There were a number of routes in Bridgeport whereby one could conveniently travel from Gintoli's place of business on Water Street to the place where Kalman Goldberger was killed on Beechmont Avenue. At the same time on a subsequent Sunday, police officers with an automobile driven at an average speed of twenty miles an hour covered the distance in approximately seven minutes by one of these routes. By a different route, at an average speed of twenty-five miles an hour, the same distance was covered in approximately nine minutes. The time of the commission of the crime was fixed with considerable accuracy at about 9.35 a. m.

The State further claimed to have established a motive for the crime from previous dealings between the deceased and the accused. From the evidence produced by the State, the jury might reasonably have found, as bearing upon the question of motive, these additional facts: Prior to 1927, the deceased conducted a wholesale produce business in Water Street. He started life with but little and built up a profitable business, accumulating a number of pieces of real estate in Bridgeport. He had taken his three sons into business with him. He could not read or write

the English language and was only able to sign his name in a legible fashion. During the year 1927, the sons formed a corporation and the deceased signed documents turning over to it his business and real-estate holdings. Some months thereafter, when the deceased learned of the effect of the documents which he had signed, a quarrel arose between the father and sons. Friends interposed in the matter and finally in that year an agreement of compromise was reached under which the sons stipulated to pay the father and his wife or the survivor of them the sum of $1000 when a certain piece of real estate was sold and further to pay to them or the survivor the sum of $40 per week for the remainder of their lives, and the father agreed to relinquish control of the real estate and the business. The agreement did not terminate the differences. In May, 1928, the deceased brought suit against his sons, charging in the complaint that they had conspired to defraud him of his property; and in December of that year, the sons filed an answer claiming fraud and bad faith on the part of the father, and that he had converted their property to his own use. The bitterness between the father and sons reached the point of physical violence. At about this time a police officer was summoned to their home and found the deceased, the accused and another son engaged in a physical struggle in the kitchen. The deceased was calling loudly for help and the sons had their hands at his neck and were thrusting him back over a table. On another occasion, while a law-suit was pending between the parties in the Superior Court, the accused was overheard calling his father vile names and threatened to "get him." They were heard quarreling upon another occasion and the accused was heard to say to his father, "Before I get through, you will be pushing a push-cart to make a

living." In 1928, Kalman Goldberger left home and went to live in another part of the city.

At the trial, the accused denied that he was the driver of the car by which his father was killed, and denied having had a conversation at the Goldberger store with Gintoli after the crime and there making a statement to the latter about repairing the truck. It is significant in this connection that the accused did not produce in his behalf to corroborate his denial his brother, Michael, whom Gintoli had testified was present at the conversation. He claimed that the relations between his father and himself were friendly, and presented eight witnesses for the purpose of showing an alibi. The claimed alibi was that the accused, at the time of the commission of the crime, was at the meatpacking house of Swift & Company on Water Street near the Goldberger store. The testimony of the witnesses to this alibi was not definite as to the time except two, one of whom testified that he was conversing with the accused at the packing house and fixed the time, by reference to a telephone conversation with New York, at 9.58 to 10.02 of that morning. Another witness fixed the time of seeing him on the sidewalk in front of the establishment between five and ten minutes after 10 a.m. The testimony of all these alibi witnesses was not inconsistent with the theory of the State that the accused was driving the automobile which struck and killed the deceased at 9.35; that sufficient time had elapsed for him to have returned the automobile and to have gone to the warehouse of Swift & Company, and to have been seen by and conversed with the witnesses who testified in support of his alibi.

The evidence that the truck was in good condition, as to its fenders and headlights, when taken that morning by the accused and that the glass in the right

headlight was broken and the right fender bent when it was returned, and further, that the glass picked up in the road near the scene of the crime fitted into the glass of the broken headlight, coupled with the clear identification of the car in so many ways by different witnesses, if believed by the jury, demonstrates beyond a reasonable doubt that Kalman Goldberger was struck and killed by the Gintoli car on that day. When the time of the crime is taken into consideration, together with the evidence as to the time when the car was taken by the accused and returned by him to a point in front of the store on Water Street, and as to the identification of the accused as the driver, the jury, acting as reasonable men and basing their verdict upon the evidence in the case, could have arrived at no other conclusion than that the accused was the driver of the death car. Taking into consideration the direct testimony as to the manner in which the truck was being driven when the deceased was struck, the fact that there was no other traffic upon the highway and no reasonable explanation of the accused not seeing the deceased walking in the street and avoiding him; the evidence of his turning to the right and striking him near the east side of the roadway, and then turning back into the highway and, in addition thereto, the conduct of the accused thereafter in driving rapidly away, although he must have recognized the person struck as his own father, and, just before disappearing from sight, turning in his car and looking backward to where the deceased was lying on the side of the road; and, when informed later by the owner that the car was damaged, his direction to Gintoli to get his truck fixed and to stop his noise, that the accused would pay for it—all this being coupled with the evidence of motive—the jury might reasonably have concluded and been satisfied beyond a rea-

sonable doubt that the killing was not accidental but intentional and, therefore, criminal as charged. Indeed, a finding that the killing was accidental or unintentional would rest upon conjecture or speculation and is not supported by any evidence presented at the trial by either side. Upon the evidence in the record, the trial court did not err in refusing to set aside the verdict. *State* v. *Chapman,* 103 Conn. 453, 468, 130 Atl. 899; *State* v. *Cianflone,* 98 Conn. 454, 459, 120 Atl. 347; *State* v. *Alderman,* 83 Conn. 597, 78 Atl. 331.

With reference to the rulings on evidence, Samuel Steinlauf, called as a witness by the State, was inquired of, in cross-examination, if he had made remarks and written a letter to a senator derogatory of the President of the United States, whether he belonged to certain societies in Bridgeport, and whether he had been punished by one of these societies for misconduct. Upon objection of the State, these questions were excluded. In this there was no error. The cross-examination of a witness for the purpose of attacking his credibility should be confined to such acts of misconduct as ought to have affected his character for veracity. *Shailer* v. *Bullock,* 78 Conn. 65, 70, 61 Atl. 65; *State* v. *Schleifer,* 102 Conn. 708, 715, 130 Atl. 184.

The State produced as a witness Carl W. Knecht, who testified that he had assisted the deceased in recording in a book payments made by the sons pursuant to the agreement for the settlement of the litigation, and that the entries were made in part by the witness from information furnished him by the deceased, and in part by the latter. The book was offered by the State as a writing made in the regular course of business. General Statutes, Cum. Sup. 1931, § 606a. Its admission was objected to by the

accused, and though the ground of objection is not clearly stated in the record, the substance thereof appears to be that the entries were no more than a record of conversation between the witness and the deceased and were, therefore, hearsay. Whether the entries in this book were admissible as business memoranda, it is unnecessary for us to determine in this case. The only relevancy of the evidence was upon the question of motive. The motive claimed by the State was hostility and ill-will between the accused and the deceased, having its inception in the business differences between the parties and continuing up to the time of the crime. The business differences were established not only by the testimony of witnesses but by the files of court showing the litigation between the parties and the written agreement of settlement. The only bearing of the entries of the book was to complete the picture and show what was done under the agreement. The book showed that certain payments had been made but that at the time of the death of the deceased some of the payments were in arrears. The State did not claim that the motive for the crime was to avoid payment of the amount due under the agreement of compromise, nor did it claim that the fact that certain payments had not been made evidenced the continuation of the hostile feeling between the accused and the deceased with respect to which there was an abundance of other testimony. The book, therefore, added little, if anything, of probative force to the evidence already in the case; and, even if it be conceded that the ruling admitting it was erroneous, the evidence could not properly have affected the result. An erroneous ruling upon evidence is not ground for reversal unless the ruling is of such a nature as would affect the verdict. *State* v. *Beaudet*, 53 Conn. 536, 539, 4 Atl. 237; *Monroe* v.

*Hartford Street Ry. Co.*, 76 Conn. 201, 209, 56 Atl. 498; *State* v. *Mosca*, 90 Conn. 381, 389, 97 Atl. 340; 1 Wigmore, Evidence (2d Ed.) § 21, p. 208.

The objection to the testimony of Lieutenant Bray as to the time required to drive an automobile from Gintoli's place of business on Water Street to the point on Beechmont Avenue where Kalman Goldberger was killed is without merit. The evidence was not offered for the purpose of showing how long the accused did take to travel that distance; it was relevant to establish the probability that the automobile involved in the crime at 9.35 could have been at Gintoli's store in about ten minutes.

The accused testified that at about 9.30 a. m. on November 20th he had a conversation with Police Sergeant Wheeler, since deceased, but upon objection by the State he was not permitted to testify that he told Wheeler that he was going over to Swift's. This ruling was correct; the alleged declaration was self-serving and not admissible. *State* v. *Bissonnette*, 83 Conn. 261, 268, 76 Atl. 288; 22 C. J., Evidence, § 193.

The petition for a new trial is based upon an affidavit of Alice Statler, who states that she was living at the time at 31 Thorme Street, practically opposite the police station. In her affidavit, she states that while sitting on her front porch about nine-thirty on that morning she saw an automobile truck, bearing the words "M. Gintoli & Son" and below in script the additional words "Italian Groceries;" that this truck made a left turn into Thorme Street from Beechmont Avenue and proceeded westerly to a point in front of the police station. She further stated that the driver climbed out of the truck on the left side, ran around in front of it to the sidewalk in front of the police station and then ran back toward Beechmont Avenue. He was gone but a few seconds then returned, jumped

into the truck and proceeded westerly toward Main Street. She identified the Gintoli truck as shown in one of the exhibits as the one she saw. She stated that she afterward saw the accused at Wethersfield. She described in her affidavit in detail the person driving the truck as young, dark, boyish appearing and not at all the appearance of the accused, and stated that she was positive that the driver was not the accused. At the hearing on the petition, she took the witness stand and her testimony while in greater part in conformity with the statements in her deposition differed from it in some respects. In her affidavit she stated that she was on her porch at that time waiting for a newspaper. In her testimony she said that she was not waiting for a paper but was waiting for her cook. Her testimony as to the movement of the truck and the driver was in contradiction to the testimony of the State's witness, Lieutenant Benedetti. The State on the hearing called a police officer who stated that he had talked with Mrs. Statler at about one o'clock on the day of the crime; that he then pointed out to her the Gintoli truck, which was parked across the street from her home, and told her that the truck had been in an accident and killed a man, and asked if she knew anything about it. Her reply was that she knew nothing at all. At the hearing upon the petition for a new trial, Mrs. Statler admitted that she had told the police officer that she knew nothing about the accident and gave as her reason for so doing that she did not wish to be involved in the matter as her cook had informed her that Italians were dangerous people. She placed the conversation with the police officer as occurring the day after the accident, whereas the officer, in his testimony, said that it occurred at one o'clock on the same day. The crime in this case occurred on November 20th, 1932; the trial was com-

menced in the Superior Court on January 31st and ended February 4th, 1933; Mrs. Statler did not do anything about the matter until early in the month of April following. Upon a petition for a new trial, the burden of proving that the newly-discovered evidence, if offered, would probably bring about a different result is upon the plaintiff, and in determining that issue upon a hearing of such a petition, the trial court exercises a discretion which cannot be reviewed unless it appears that its discretionary power has been abused. *Widman* v. *Kearns,* 96 Conn. 254, 258, 114 Atl. 77; *Link* v. *State,* 114 Conn. 102, 107, 157 Atl. 867; *Gannon* v. *State,* 75 Conn. 576, 578, 54 Atl. 199; *Kliarsky* v. *Eastern Greyhound Lines, Inc.,* 116 Conn. 649, 651, 166 Atl. 55.

In view of all these circumstances and the State's evidence tending to show that the accused was the driver of the truck in question at the time of the crime, we cannot say that the trial court was in error in concluding that the evidence of Mrs. Statler, contradictory in part with the evidence of the State's witness and contradicted by her own statement when first asked about the matter, was not of such a nature as would probably produce a different result if a new trial was had or abused its discretion in denying it.

There is no error.

In this opinion the other judges concurred.