******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

## STATE OF CONNECTICUT *v.* PATRICIA DANIELS
## (AC 46053)

Cradle, Suarez and Clark, Js.

*Syllabus*

The defendant appealed from the judgment of the trial court following her conviction of, inter alia, manslaughter in the first degree. She claimed that the evidence was insufficient to support the conviction of intentional manslaughter and that the trial court committed error in its jury instruction concerning the element of intent. *Held*:

The state presented evidence from which the jury reasonably could have found beyond a reasonable doubt that the defendant collided with the victim's vehicle intending to cause serious physical injury to another person.

The defendant, having implicitly waived any objection to the trial court's instruction to the jury on the element of intent, was unable to demonstrate that a constitutional violation occurred that deprived her of a fair trial, and she failed to demonstrate that she was entitled to relief under the plain error doctrine.

Argued May 23—officially released October 1, 2024

*Procedural History*

Substitute information charging the defendant with two counts of the crime of manslaughter in the first degree, and with one count each of the crimes of misconduct with a motor vehicle, risk of injury to a child, and evasion of responsibility in the operation of a motor vehicle, brought to the Superior Court in the judicial district of Fairfield and tried to the jury before *Kavanewsky, J.*; verdict of guilty; thereafter, the court vacated the conviction as to one count of manslaughter in the first degree, and rendered judgment of guilty of manslaughter in the first degree, misconduct with a motor vehicle, risk of injury to a child, and evasion of responsibility in the operation of a motor vehicle, from which the defendant appealed to this court, *Lavine, Bright* and *Bear, Js.*, which reversed in part the trial court's judgment; subsequently, the state, on the granting of certification, appealed to the Supreme Court,

which reversed in part the judgment of this court and remanded the case to this court with direction to remand the case to the trial court with direction to reinstate the defendant's intentional manslaughter conviction, to sentence the defendant on that count, and to resentence the defendant on the remaining counts of conviction; thereafter, the defendant appealed to this court. *Affirmed.*

*Laila M.G. Haswell*, senior assistant public defender, with whom, on the brief, was *Ruth Burke*, certified legal intern, for the appellant (defendant).

*Denise B. Smoker*, senior assistant state's attorney, with whom, on the brief, were *Joseph T. Corradino*, state's attorney, and *Marc R. Durso*, senior assistant state's attorney, for the appellee (state).

*Opinion*

SUAREZ, J. The defendant, Patricia Daniels, appeals from the judgment of conviction, following a jury trial, of manslaughter in the first degree in violation of General Statutes § 53a-55 (a) (1) (intentional manslaughter). The defendant claims that (1) the evidence was insufficient to support the conviction and (2) the court committed instructional error in its jury instruction concerning the essential element of intent. We affirm the judgment of the trial court.

In connection with a prior appeal, this court previously summarized the facts, as reasonably could have been found by the jury, as follows: "The victim, Evelyn Agyei, left her Bridgeport home at approximately 6 a.m. on December 4, 2014. Her eleven year old son accompanied her. Agyei and her son got into her Subaru Outback (Subaru), Agyei driving and her son in the back seat on the passenger's side. After traversing some back roads, they took Bond Street and arrived at the intersection of Bond Street and Boston Avenue. Agyei stopped

at the red light and then proceeded to make a right turn onto Boston Avenue, staying in the right lane. As she was making the right turn, her son looked to the left and saw a white BMW sport utility vehicle (BMW) approximately two streets down, traveling at a high rate of speed in the left lane.

"After Agyei [turned] onto Boston Avenue, the driver of the BMW pulled alongside Agyei's vehicle. Agyei's son saw the BMW logo on the hood; however, he could not see the driver or the license plate. The driver of the BMW then moved into the right lane, hitting Agyei's Subaru once on the driver's side and causing her to begin to lose control of the vehicle. The driver of the BMW then moved behind the Subaru and ran into it from behind, causing the vehicle to cross the median, proceed under a fence, and hit a tree. Tragically, Agyei died from her injuries, and her son, who also was injured, continues to have vision problems as a result of the injuries he sustained. After an investigation . . . the police, having concluded that the defendant was the driver of the BMW that hit the Subaru [and] caus[ed] Agyei's death and the injuries to Agyei's son, arrested the defendant." *State* v. *Daniels*, 191 Conn. App. 33, 36–37, 213 A.3d 517 (2019), rev'd in part, 342 Conn. 538, 271 A.3d 617 (2022).

In a long form information, the defendant was charged with intentional manslaughter, manslaughter in the first degree in violation of § 53a-55 (a) (3) (reckless manslaughter), misconduct with a motor vehicle in violation of General Statutes § 53a-57 (a) (criminally negligent operation), risk of injury to a child in violation of General Statutes § 53-21 (a) (1), and evasion of responsibility in the operation of a motor vehicle in violation of General Statutes § 14-224 (a). The jury found the defendant guilty of all of these charged offenses, and the court accepted the jury's verdict. At the time of the defendant's sentencing, the trial court vacated the

intentional manslaughter conviction at the state's request so as to avoid double jeopardy implications pursuant to *State* v. *Polanco*, 308 Conn. 242, 61 A.3d 1084 (2013). See id., 245 ("when a defendant has been convicted of greater and lesser included offenses, the trial court must vacate the conviction for the lesser offense rather than merging the convictions"). With respect to the remaining charged offenses, the court imposed a total effective sentence of twenty years of incarceration, execution suspended after sixteen years, followed by five years of probation.

In a prior appeal to this court, the defendant claimed, in part, that the trial court had erred in accepting the jury's guilty verdicts on the intentional manslaughter, reckless manslaughter, and criminally negligent operation charges because they were legally inconsistent insofar as each offense required a mutually exclusive mental state. See *State* v. *Daniels*, supra, 191 Conn. App. 36. This court concluded that the convictions of reckless manslaughter and criminally negligent operation were legally inconsistent but that neither conviction was legally inconsistent with the conviction of intentional manslaughter. Id., 49, 51, 53. This court reversed the judgment of conviction with respect to the counts of reckless manslaughter and criminally negligent operation and remanded the case to the trial court for a new trial as to those charges as well as the charge of intentional manslaughter. Id., 62–63.

Thereafter, our Supreme Court granted the state's petition for certification to appeal with respect to the following issue: "Did the Appellate Court improperly order a new trial rather than reinstate the defendant's conviction of intentional manslaughter in the first degree, which was vacated for sentencing purposes under *State* v. *Polanco*, [supra, 308 Conn. 242]?" *State* v. *Daniels*, 333 Conn. 918, 216 A.3d 651 (2019). In *State* v. *Daniels*, 342 Conn. 538, 271 A.3d 617 (2022), our

Supreme Court agreed with the state that this court had improperly ordered a new trial on the charges of intentional manslaughter, reckless manslaughter, and criminally negligent operation, rather than reinstating the intentional manslaughter conviction. Id., 547. Relying on *State* v. *Wright*, 320 Conn. 781, 135 A.3d 1 (2016), *State* v. *Miranda*, 317 Conn. 741, 120 A.3d 490 (2015), and *State* v. *Polanco*, supra, 308 Conn. 242, our Supreme Court concluded that the legal inconsistency in the verdict as to the reckless manslaughter and criminally negligent operation charges did not taint the intentional manslaughter conviction and that the reinstatement of the latter conviction was the proper remedy. See *State* v. *Daniels*, supra, 342 Conn. 554. Accordingly, our Supreme Court reversed the judgment of this court solely with respect to the remedy afforded the defendant in her direct appeal to this court. See id., 562–63. The Supreme Court remanded the case to this court "with direction to remand the case to the trial court with direction to reinstate the defendant's intentional manslaughter conviction, to sentence the defendant on that count, and to resentence the defendant on the remaining counts of conviction . . . ." Id. Following our remand to the trial court, the trial court imposed a total effective sentence of seventeen years of incarceration, execution suspended after thirteen years, followed by five years of probation for the crimes of which the defendant presently stands convicted, namely, intentional manslaughter, risk of injury to a child, and evasion of responsibility in the operation of a motor vehicle. This appeal followed.[1] In light of the claims raised on appeal, the defendant asks this court to reverse the intentional manslaughter conviction and order either a directed verdict of not guilty on that

---

[1] In this appeal, the defendant does not challenge the judgment of conviction as to the crimes of risk of injury to a child or evasion of responsibility in the operation of a motor vehicle.

charge or a new trial on that charge. Additional facts will be set forth as necessary.

## I

First, the defendant claims that the evidence was insufficient to support the conviction of intentional manslaughter. Specifically, the defendant argues that the jury could not reasonably have found that she acted with the requisite mental state necessary for the commission of intentional manslaughter, the specific intent to cause serious physical injury. The defendant argues that, on the basis of the evidence before the jury, "it is impossible to ascertain whether [she] changed lanes to hit [Agyei's] car or whether she simply did not see [Agyei's] car. None of her actions before or after evidences any intent to run [Agyei's] car off the road. Second, even if the evidence is sufficient to show that the incident was intentional, it is not sufficient to show that [the defendant] intended to cause serious physical injury."

We begin by setting forth the principles that govern our consideration of the claim. "[A] defendant who asserts an insufficiency of the evidence claim bears an arduous burden. . . . [F]or the purposes of sufficiency review . . . we review the sufficiency of the evidence as the case was tried . . . . [A] claim of insufficiency of the evidence must be tested by reviewing no less than, and no more than, the evidence introduced at trial. . . . In reviewing a sufficiency of the evidence claim, we apply a two part test. First, we construe the evidence in the light most favorable to sustaining the verdict. Second, we determine whether upon the facts so construed and the inferences reasonably drawn therefrom the [jury] reasonably could have concluded that the cumulative force of the evidence established guilt beyond a reasonable doubt . . . . This court cannot substitute its own judgment for that of the jury if

there is sufficient evidence to support the jury's verdict. . . .

"[T]he jury must find every element proven beyond a reasonable doubt in order to find the defendant guilty of the charged offense, [but] each of the basic and inferred facts underlying those conclusions need not be proved beyond a reasonable doubt. . . . If it is reasonable and logical for the jury to conclude that a basic fact or an inferred fact is true, the jury is permitted to consider the fact proven and may consider it in combination with other proven facts in determining whether the cumulative effect of all the evidence proves the defendant guilty of all the elements of the crime charged beyond a reasonable doubt. . . . Moreover, it does not diminish the probative force of the evidence that it consists, in whole or in part, of evidence that is circumstantial rather than direct. . . . It is not one fact . . . but the cumulative impact of a multitude of facts which establishes guilt in a case involving substantial circumstantial evidence. . . . In evaluating evidence, the [jury] is not required to accept as dispositive those inferences that are consistent with the defendant's innocence. . . . The [jury] may draw whatever inferences from the evidence or facts established by the evidence [that] it deems to be reasonable and logical. . . .

"[O]n appeal, we do not ask whether there is a reasonable view of the evidence that would support a reasonable hypothesis of innocence. We ask, instead, whether there is a reasonable view of the evidence that supports the jury's verdict of guilty." (Internal quotation marks omitted.) *State* v. *Raynor*, 175 Conn. App. 409, 424–26, 167 A.3d 1076 (2017), aff'd, 334 Conn. 264, 221 A.3d 401 (2019).

"It is well established that the question of intent is purely a question of fact. . . . The state of mind of one accused of a crime is often the most significant and, at

the same time, the most elusive element of the crime charged. . . . Because it is practically impossible to know what someone is thinking or intending at any given moment, absent an outright declaration of intent, a person's state of mind is usually proven by circumstantial evidence . . . . Intent may be and usually is inferred from [conduct. . . . Whether] such an inference should be drawn is properly a question for the jury to decide. . . . [I]ntent may be inferred from the events leading up to, and immediately following, the conduct in question . . . the accused's physical acts and the general surrounding circumstances." (Citation omitted; internal quotation marks omitted.) *State* v. *Thompson*, 146 Conn. App. 249, 277–78, 76 A.3d 273, cert. denied, 310 Conn. 956, 81 A.3d 1182 (2013). "[T]he determination of [intent] should stand unless the conclusion drawn by the trier is an unreasonable one. . . . [T]he [trier of fact is] not bound to accept as true the defendant's claim of lack of intent or his explanation of why he lacked intent. . . . Furthermore, it is a permissible, albeit not a necessary or mandatory, inference that a defendant intended the natural consequences of his voluntary conduct." (Internal quotation marks omitted.) *State* v. *Leuders*, 225 Conn. App. 612, 625, 317 A.3d 69 (2024).

We now turn to the essential element of the offense at issue in the present claim. Section 53a-55 (a) provides in relevant part: "A person is guilty of manslaughter in the first degree when: (1) With intent to cause serious physical injury to another person, he causes the death of such person or of a third person . . . ." Intentional manslaughter is a specific intent offense; the state bore the burden of proving beyond a reasonable doubt that the defendant intended to cause serious physical injury to another person. Our legislature defines "[s]erious physical injury" as "physical injury which creates a

substantial risk of death, or which causes serious disfigurement, serious impairment of health or serious loss or impairment of the function of any bodily organ . . . ." General Statutes § 53a-3 (4).

The state presented evidence from which the jury reasonably could have found the following facts about the automobile collision that led to Agyei's death.[2] The collision occurred on a portion of Boston Avenue that consists of a four lane road that is divided by a landscaped median. Two lanes of travel proceed eastbound and two lanes of travel proceed westbound. The automobile operated by the defendant approached Agyei's automobile at a high rate of speed as Agyei made a right turn from Bond Street onto Boston Avenue. The defendant, who was in the left lane, pulled alongside Agyei's vehicle, which was in the right lane. At this point in time, Agyei's eleven year old son noticed the defendant approach in what he would later describe to be a white BMW SUV. As both automobiles moved in the same direction, the front of the defendant's automobile struck the rear driver's side of Agyei's automobile. Agyei began to lose control of her automobile. Seconds later, the defendant moved into the right lane, behind Agyei, and the front of her automobile struck the rear of Agyei's automobile a second time. As a result of the impact, Agyei lost control of her automobile and it crossed the median, proceeded under a fence, and struck a tree.

The state also presented evidence about the defendant's conduct following the collision. There was no

_____

[2] This version of events is consistent with the trial testimony of Agyei's son as well as images of the collision that were recorded by surveillance cameras at a nearby school. The defendant does not dispute that the evidence permitted the jury to find these facts about how the collision occurred but argues that the jury could not reasonably have concluded that she acted with the requisite mental state for the commission of intentional manslaughter. Instead, she argues that "[t]he video shows [her automobile] striking [Agyei's automobile], both cars losing control, and [her automobile] striking [Agyei's automobile] again. The video shows that this was a terrible accident. It does not show specific intent to harm the Agyeis."

dispute that the operator of the automobile that collided with Agyei fled the scene on December 4, 2014. The police, relying on the description of the automobile involved in the collision provided by Agyei's son, began contacting registered owners of BMW SUVs. Ultimately, they questioned the defendant at her home in Bridgeport on December 16, 2014. The defendant permitted the police to inspect her white BMW SUV in the driveway. The police immediately noticed that the front bumper of the automobile was damaged in a manner consistent with it having been involved in the collision that led to Agyei's death. This led to the police impounding the automobile.[3]

When officers spoke with the defendant at her home on December 16, 2014, she told them that she first noticed the damage to her automobile on December 8, 2014, after she had been released from a four day stay in a hospital for psychiatric treatment.[4] With respect to her whereabouts on December 4, 2014, the date of the collision, she stated that she had been having "some psychological issues" and that she left her home "at around 6 or 6:30 that morning and drove herself to St. Vincent's Hospital and checked herself in to the psych

---

[3] The state presented evidence of the results of a forensic analysis of both the defendant's automobile and Agyei's automobile. The results of such analysis, including an analysis of paint samples taken from both automobiles, supported a conclusion that the defendant's automobile had struck Agyei's automobile.

[4] The defendant presented evidence that she had been admitted voluntarily to St. Vincent's Medical Center on December 4, 2014. Brunoi Germain, a psychiatrist employed by the hospital who treated the defendant, determined that she was not stable enough to be released until December 8, 2014, in part because she had made comments reflecting that she could have posed a danger to her granddaughter in that she had expressed thoughts of kidnapping her. Germain diagnosed the defendant as having an unspecified mood disorder and she received mood stabilizer and antipsychotic medications during her hospital stay.

We note that, although the jury was presented with evidence about the defendant's mental state at the time of the events at issue, the defendant did not assert a defense of diminished capacity.

unit.'' She stated that her route to the hospital included driving westbound on Boston Avenue in Bridgeport. The defendant described some of the "issues" she had been experiencing on December 4, 2014, which included her relationship with her fiancé, whom she identified as David Adkins. The defendant showed the officers wedding rings she had purchased. The defendant told the police that she was speaking with Adkins while driving herself to the hospital and that she met Adkins at the hospital before she decided "to check herself in." The defendant also told the police that she was under the belief that her granddaughter was being sexually molested and that she was so upset that she was unable to breathe and had not slept in several days.

The state presented evidence that the defendant voluntarily provided the police with sworn, recorded statements on December 17 and 18, 2014. In her statement of December 17, 2014, the defendant reiterated many of the representations that she had made to the police the day before. She also told the police that, earlier in the year, she had been involved in an automobile accident in Waterbury in which she collided with a parked automobile. She also explained that she drove to St. Vincent's Medical Center on December 4, 2014, rather than Bridgeport Hospital, which was considerably closer in distance to her residence, because she had received psychiatric treatment at St. Vincent's Medical Center in 2003, and she did not believe that Bridgeport Hospital had a psychiatric unit. In her much shorter statement on December 18, 2014, the defendant expressed her displeasure with the police for having publicly identified her as a suspect in the crimes that occurred on December 4, 2014.

The state presented evidence from which the jury reasonably could have found that some of the defendant's representations to the police were false. For example, the state presented testimony from Adkins

that he was the pastor of a church in New Haven that the defendant had attended over the course of many years. Adkins testified that he had never been engaged to the defendant, given the defendant an engagement ring, or been in a romantic or sexual relationship with her. Moreover, Adkins testified that he did not speak with the defendant on December 4, 2014, nor was he in Bridgeport that day. Cell phone records presented by the state corroborated portions of his testimony.

There was undisputed evidence that the defendant had, in fact, used her cell phone near 6:29 a.m., when the collision occurred. The parties stipulated that the defendant called 911 from her cell phone at 6:24 a.m. The 911 dispatcher called her back immediately thereafter. The defendant called 911 again at 6:25 a.m. The state presented evidence that the defendant sought police assistance for what she described as a violent incident involving several armed men, a woman, and a baby at the intersection of Coleman Street and Vine Street in Bridgeport. She stated that she was observing this incident from a beige Nissan Maxima. When police officers responded to the location described by the defendant, they did not find any evidence of the armed disturbance that she had described.

From the evidence presented at trial, the jury reasonably could have found beyond a reasonable doubt that the defendant collided with Agyei intending to cause serious physical injury to another person. First, there was evidence of the defendant's mental state generally in the moments leading up to the collision. There was evidence that the defendant made the decision to check herself into a hospital for what she described as mental issues, that she was upset about her relationship with Adkins, and that she was so distraught about the situation that she perceived involving her granddaughter that she was unable to breathe and had not slept in several days. The jury, thus, reasonably could infer that

the defendant was agitated, not calm, as she drove herself to the hospital seeking treatment for what was later diagnosed as a mood disorder.

Second, the jury reasonably could have drawn inferences about the defendant's mental state from the manner in which she operated her automobile, an instrumentality that is capable of causing serious physical injury. In her agitated state, she approached Agyei while traveling at a high rate of speed. She initially struck the rear driver's side of Agyei's automobile while she was steering into the right lane. Seconds later, she moved into the right lane directly behind Agyei's automobile and struck the rear of it with sufficient force to cause it to spin out of control. The fact that the defendant did not bring her automobile to a stop or otherwise take steps to avoid striking Agyei following the initial collision, but instead struck Agyei a second time, causing Agyei to lose control, cross the median, and, ultimately, strike a tree, supported a finding that the defendant intended to cause serious physical injury. The jury also was presented with photographs of Agyei's automobile following the collision as well as the surveillance footage taken of the collision. The jury reasonably could have inferred that, at the time of the collision, Agyei's automobile should have been visible to other drivers, including the defendant, and the fact that the defendant struck Agyei's automobile twice, viewed in light of the evidence as a whole, reflected an intent to cause serious physical injury.

Third, the jury reasonably could have found that, in the aftermath of the collision, the defendant engaged in conduct that demonstrated her intent to cause serious physical injury and her consciousness of guilt.[5] "Evidence that an accused has taken some kind of evasive action to avoid detection for a crime, such as flight,

---

[5] The court delivered a consciousness of guilt jury instruction in this case.

concealment of evidence, or a false statement, is ordinarily the basis for a [jury] charge on the inference of consciousness of guilt." (Internal quotation marks omitted.) *State* v. *Vasquez,* 133 Conn. App. 785, 800, 36 A.3d 739, cert. denied, 304 Conn. 921, 41 A.3d 661 (2012). The evidence demonstrated that the defendant fled the scene of the collision rather than stopping to help the occupants of Agyei's automobile or summon first responders to the scene. The jury could reasonably have inferred that the defendant's failure to summon aid immediately following the collision supported a finding that she, in fact, intended to cause serious physical injury by striking Agyei's automobile. Moreover, when the police located the defendant and questioned her concerning the events of December 4, 2014, she provided false information that tended to exculpate herself from her criminal conduct. Specifically, the defendant told the police that she was engaged to Adkins, that she was speaking on her cell phone with Adkins at the time of the collision, and that Adkins met her at the hospital that morning. The jury reasonably could have found that all of these statements were false and that the defendant had made these false statements knowingly because she knew that she had intentionally caused the collision that led to Agyei's death.

The defendant urges us to conclude that the evidence of intent was insufficient because, here, "there is simply no indicia that [she] intended to hit [Agyei's automobile] or even knew it was there." She also argues that, here, "[she] did not display any sort of intent to seriously physically injure. There was no prior indication that she arbitrarily felt like running total strangers off the road to hurt them. Nor did the evidence ever show any relationship at all with the Agyei family, much less an acrimonious one." The defendant urges us to conclude that the state failed to prove the requisite intent because "the surrounding circumstances" do not suggest that

she intended to harm the victims in this case and the manner in which the collision occurred reflects "that this was a terrible accident."

The defendant's arguments invite this court to construe the evidence in the light most favorable to the defense. As we explained previously, our role in evaluating the sufficiency of the evidence is to evaluate the evidence in the light most favorable to sustaining the verdict. To the extent that the defendant argues that, in contrast with other cases, the evidence was insufficient because the circumstances surrounding the collision did not readily explain her *motive* to cause serious physical injury to the particular victims of her criminal conduct, her argument puts a higher burden on the state than is required.[6] The state was not required to prove that an acrimonious relationship existed between

---

[6] The defendant relies on *State* v. *Goldberger*, 118 Conn. 444, 173 A. 216 (1934) (affirming conviction of murder in second degree); *State* v. *Santiago*, 206 Conn. App. 390, 260 A.3d 585 (affirming conviction of attempt to commit assault in first degree and attempt to commit assault of peace officer), cert. denied, 339 Conn. 918, 262 A.3d 138 (2021); and *State* v. *Andrews*, 114 Conn. App. 738, 971 A.2d 63 (affirming conviction of attempt to commit assault in first degree and attempt to commit assault of peace officer), cert. denied, 293 Conn. 901, 975 A.2d 1277 (2009). First, these cases are factually distinguishable, and they do not require as a matter of law that intent be proven by means of any specific type of evidence. They reflect that the issue of intent is inherently fact bound and must be evaluated on a case-by-case basis. Second, even if we assume, arguendo, that the state's evidence of intent was stronger in these cases than in the present case, it in no way undermines the inquiry before us based on the evidence in the present case. Although these cases may be instructive, they are not dispositive. We must construe the evidence in the present case in the light most favorable to the state and to determine whether, in light of the evidence so construed, the jury could have found beyond a reasonable doubt that the defendant acted with the requisite intent.

The defendant also relies on out of state cases, including *State* v. *Chalmers*, 100 Ariz. 70, 411 P.2d 448 (1966); *Commonwealth* v. *Comer*, 552 Pa. 527, 716 A.2d 593 (1998); and *Commonwealth* v. *O'Hanlon*, 539 Pa. 478, 653 A.2d 616 (1995). These cases, which are factually distinguishable from the present case, do not affect our evaluation of whether the evidence presented in the present case supported the jury's finding that the defendant acted with the specific intent to cause serious physical injury.

the defendant and one or more occupants of Agyei's automobile or that the defendant stood to gain by causing one or more occupants serious physical injury. Although evidence of such facts would have been relevant to the issue of the defendant's intent, our inquiry is to evaluate the evidence that was before the jury.

Here, for the reasons we have explained, the evidence of the defendant's operation of her automobile, the evidence of her agitated state prior to the events at issue, and her conduct following the collision afforded the jury a basis upon which to find beyond a reasonable doubt that she intended to inflict serious physical injury.

## II

Next, the defendant claims that the court committed instructional error in its jury instruction concerning the essential element of intent. Specifically, the defendant challenges the portion of the court's intent instruction in which it stated that an inference that there was intent to cause serious physical injury could be drawn from her use of an automobile during the events at issue. Primarily, the defendant argues that the court's instruction violated her due process right to a fair trial. Alternatively, the defendant argues that the instruction constitutes plain error. We conclude that the defendant waived her constitutional challenge at trial and that she has failed to demonstrate that she is entitled to relief under the plain error doctrine.

The following additional facts are relevant to this claim. On December 7, 2016, after the parties rested their cases, the court dismissed the jury for the day and the following colloquy with counsel occurred:

"The Court: [H]ow much time, if any, do the attorneys need before they see me on the charge conference?

"[Defense Counsel]: Judge, have we seen a copy of the charge yet? I've not.

"[The Prosecutor]: I haven't—

"[Defense Counsel]: I don't need any. I'm prepared to . . . attend now if there's nothing to review. I'm prepared.

"[The Prosecutor]: Yeah, we can . . . discuss it now.

"The Court: No, I don't have a written copy—

"[The Prosecutor]: Oh.

"The Court: —printed out, but I will give you one . . . once I do it, but I don't.

"[Defense Counsel]: I'm prepared now.

"The Court: Okay. State ready, too?

"[The Prosecutor]: Yes, Your Honor.

"The Court: Okay, then this [is] what we'll do. I'm going to adjourn in a moment. I'll . . . see the attorneys in back for a charge conference. We'll put the results of the charge conference on the record tomorrow, as is required before argument, and then the attorneys will be prepared to argue the case."

The next morning, the court began the proceeding, outside of the presence of the jury, by stating that it was providing "replacement pages" to the attorneys for the portion of its charge in which it discussed the offense of evasion of responsibility. The following colloquy between the court, the prosecutor, and defense counsel followed:

"The Court: I want to summarize the charge conference we had briefly yesterday and into today.

"I did send a copy of the substantive offenses to counsel by email last night . . . 8 p.m., 8:30 thereabouts. The only change I made to that, I think, relates to the evasion of responsibility count that we just talked

about. Then earlier this morning, I sent the entirety of the charge.

"In terms of the way I do intend to charge and the charge conference we had, I'm going to go over what I'll just call, very briefly, the headnotes.

"I'm going to charge on the function of the court and jury, the presumption of innocence, burden of proof, reasonable doubt, evidence, circumstantial and direct evidence, inferences, credibility of witnesses, evaluating credibility of witnesses.

"I'm also doing an instruction on evidence admitted for a limited purpose. We've gone over that, and I've given you a copy of that, relating to the use of certain evidence by way of what the defendant may have said to others, expert testimony, the testimony of police officers.

"I am giving an instruction on evidence of consciousness of guilt as requested by the state. I know there's a defense objection to that. But it will relate primarily to issues of flight, if in fact they deem she was involved in an incident and did, in fact, flee, and that was unexplained. And also relating to purported statements she made [concerning] [Adkins].

"The state put on evidence that would appear to contradict those. It's for the jury to determine whether or not the defendant's statements that were made and were false or not. But if they choose to believe she made them and they are false, they can use that as evidence of consciousness of guilt. That's all in my instructions.

"I am giving an instruction on the defendant's election not to testify, the nature of the information and then I'm going to instruct on manslaughter first in count one, intentional manslaughter first recklessness indifference in count two.

"I am giving a lesser included offense on count two of manslaughter second. I'm going to instruct count three, misconduct with a motor vehicle, and I am going to give a lesser offense there that was requested by both sides, negligent homicide with motor vehicle. I'm going to give a count four, risk of injury to a minor, situation risk.

"Count five, evading responsibility—we've talked about that, and then the concluding remarks; notetaking, how they're to render their verdicts, the irrelevance of any punishment, the duties upon retiring and how they're to communicate with the court.

"Now, just in terms of the charge conference, is there anything the state wants to add or correct concerning that?

"[The Prosecutor]: No, I don't believe so, Your Honor.

"The Court: The defense?

"[Defense Counsel]: No, sir.

"The Court: Okay. Then will the attorneys be ready when the jury comes out to argue?

"[The Prosecutor]: Yes, Your Honor.

"[Defense Counsel]: Yes, Judge. I—I heard the court say that it noted our objection to the consciousness of guilt charge. I just want to say the word so that it's not waived. We . . . object to giving that charge.

"The Court: Okay.

"[Defense Counsel]: I just want to make sure nobody claims waiver, you know.

"The Court: No. It's clear you're objecting, okay."

Thereafter, the prosecutor and defense counsel made closing arguments to the jury. The court then delivered its jury charge. The court provided the following

instruction concerning the requisite intent for intentional manslaughter: "For you to find the defendant guilty of this charge, the state must prove the following elements beyond a reasonable doubt. The first element is that the defendant specifically intended to cause serious, physical injury to another person. Intent relates to condition of mind of the person who commits the act; her purpose in doing it. Specific intent is the intent to achieve a specific result. It is a conscious objective to cause such result. The specific intent for the crime of intentional manslaughter in the first degree is the intention to cause serious, physical injury to another person; here, [Agyei]. There is no particular length of time necessary for a defendant to have formed the specific intent to cause such injury.

"What the defendant intended is a question of fact for you to determine. You should consider all of the evidence as it pertains to the defendant's intent. What a person's intention was is usually a matter to be determined by inference. No person is able to testify that he looked into another's mind and saw therein a certain knowledge or a certain purpose or intention to do harm to another. Because direct evidence of the defendant's state of mind is rarely available, intent is generally proved by circumstantial evidence. The only way a jury can ordinarily determine what a person's intention was at any given time, is by determining what the person's conduct was and what the circumstances were surrounding that conduct, any words spoken by the defendant and any statements she made. To draw an inference concerning someone's intent from this circumstantial evidence is the proper function of a jury, provided of course that the inference drawn complies with the standards for inferences as explained in connection with my instruction on circumstantial evidence. The inference is not a necessary one. You're not required to infer a particular intent from such evidence,

but it is an inference that you may draw if you find it is reasonable and logical.

"You may also consider the nature of the injuries inflicted upon the decedent, as well as the instrumentality, the motor vehicle, as evidence [of] intent, and from such evidence an inference may be drawn that there was intent to cause serious, physical injury. Any inference that may be drawn from the nature of the instrumentality used and the manner of its use is then an inference of fact to be drawn by you upon consideration of these and other circumstances in the case in accordance with my previous instructions. Remember that the burden of proving intent beyond a reasonable doubt is on the state."

After it delivered its charge, the court, outside of the presence of the jury, separately asked the prosecutor and defense counsel whether there were any exceptions to the charge. The state raised an issue with respect to the court's instruction concerning expert testimony that did not ultimately lead to a corrected instruction. Defense counsel, renewing his earlier objection, stated that he took exception "[o]nly with respect to consciousness of guilt, sir, nothing else."

We first address the defendant's argument that the portion of the court's instruction concerning intent in which it permitted the jury to consider her use of an automobile violated her right to due process. The defendant acknowledges before this court that she did not preserve this claim for review, but she seeks review pursuant to the bypass rule set forth in *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). "Pursuant to *Golding*, a [defendant] can prevail on a claim of constitutional error not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error;

(2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the [defendant] of a fair trial; and (4) if subject to harmless error analysis, the [state] has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. . . . The first two steps in the *Golding* analysis address the reviewability of the claim, [whereas] the last two steps involve the merits of the claim." (Emphasis in original; internal quotation marks omitted.) *In re Gabriella M.*, 221 Conn. App. 827, 836, 303 A.3d 319, cert. denied, 348 Conn. 925, 304 A.3d 443 (2023).

The state argues that the defendant implicitly waived the unpreserved claim of a constitutionally defective jury instruction under *State* v. *Kitchens*, 299 Conn. 447, 10 A.3d 942 (2011), and that she is therefore unable to prevail under *Golding*. In *Kitchens*, our Supreme Court reasoned that "when the trial court provides counsel with a copy of the proposed jury instructions, allows a meaningful opportunity for their review, solicits comments from counsel regarding changes or modifications and counsel affirmatively accepts the instructions proposed or given, the defendant may be deemed to have knowledge of any potential flaws therein and to have waived implicitly the constitutional right to challenge the instructions on direct appeal." Id., 482–83.

In the present case, the record reflects, and the parties do not dispute, that the court provided the parties with a written copy of its proposed jury instructions by email at approximately 8:30 p.m. on December 7, 2016. The proposed instructions contained the instruction that is the subject of the present claim. We are persuaded that, because counsel had the instructions overnight, the court afforded counsel a meaningful opportunity to review the proposed instructions prior to the court proceeding on the following day. See, e.g.,

*State* v. *Davis*, 311 Conn. 468, 480–81, 88 A.3d 445 (2014) (opportunity to review proposed jury instructions over-night amounts to meaningful review); *State* v. *Leach*, 165 Conn. App. 28, 33–34, 138 A.3d 445 (same), cert. denied, 323 Conn. 948, 169 A.3d 792 (2016).

The defendant argues that this court should narrowly define what satisfies an opportunity to review jury instructions "overnight." Specifically, the defendant argues that " '[o]vernight' should mean that the court must provide the advanced copy by 5 p.m., and it must be delivered in person and on the record. By 8 p.m., time is getting very short. This court should consider that the attorneys may have family or other obligations in the evenings. Moreover, if the copy is delivered by email, the attorney may not see it for a few more hours, if at all. There is no guarantee that it will even show up in the attorneys' inboxes." The defendant's argument in this regard is not persuasive. As the record reflects, on December 8, 2016, when the court asked counsel about the proposed jury instructions that it had emailed to counsel the night prior, defense counsel in no way indicated that he did not have a meaningful opportunity to review the instructions. In line with his basic duty to review the instructions on behalf of the defendant, it was reasonable for the court to expect that defense counsel had an affirmative obligation to inform the court if he was not prepared to proceed or needed more time to prepare to discuss the proposed jury charge. No such requests were made by defense counsel even though the court did not in any way suggest that it would not afford counsel more time, if requested, to review the proposed charge. Contrary to the arguments being raised presently, defense counsel did not state that other obligations prevented him from reviewing the instructions overnight, that he did not timely notice the proposed instructions in his email, or that he simply never received them in his email. Instead, all of defense

counsel's responses to the court's inquiries unequivocally indicated that he was ready to address the substance of the court's draft jury charge and proceed to closing arguments.

This court does not apply the implicit waiver doctrine set forth in *Kitchens* in a rigid or mechanistic fashion. We are ever mindful that an evaluation of waiver must be made on a case-by-case basis and that, "in most instances, a combination of facts and circumstances rather than any single fact will support a finding of waiver." *State* v. *Bellamy*, 323 Conn. 400, 411, 147 A.3d 655 (2016). We decline to resolve the waiver issue in the present case on hypothetical facts that are foreign to the record before us. Neither our *Kitchens* case law nor the unique facts of the present case support the defendant's argument that defense counsel's ability to review the emailed proposed jury instructions overnight did not amount to a meaningful opportunity for review.

The following morning, when the court solicited comments from counsel regarding changes or modifications, defense counsel affirmatively accepted the instructions proposed by the court. The court specifically referred to its instruction on "manslaughter first in count one" and thereafter asked defense counsel if there was anything "to add or correct" in its proposed charge. Defense counsel replied, "No, sir." Following the charge, defense counsel did not take an exception to the charge based on the intent instruction at issue in the present claim.

Because, under *Kitchens*, the defendant implicitly waived any objection to the court's intent instruction, she is unable to demonstrate under *Golding*'s third prong that a constitutional violation occurred that deprived her of a fair trial.

We now turn to the defendant's argument that the portion of the court's instruction concerning intent in

which it permitted the jury to consider her use of an automobile constitutes plain error. See Practice Book § 60-5.[7] It is well settled that a conclusion that an implicit waiver under *Kitchens* has occurred does not necessarily preclude appellate relief under the plain error doctrine with respect to that same claim. See *State* v. *McClain*, 324 Conn. 802, 808, 155 A.3d 209 (2017).

"[I]f a claim is unpreserved . . . an appellate court may in the interests of justice notice plain error not brought to the attention of the trial court. . . . Application of the plain error doctrine is nevertheless reserved for truly extraordinary situations [in which] the existence of the error is so obvious that it affects the fairness and integrity of and public confidence in the judicial proceedings. . . . [Thus, a] defendant cannot prevail under [the plain error doctrine] . . . unless he demonstrates that the claimed error is both so clear and so harmful that a failure to reverse the judgment would result in manifest injustice. . . .

"There is a two step framework for evaluating claims under the plain error doctrine. First, we must determine whether the trial court in fact committed an error and, if it did, whether that error was indeed plain in the sense that it is patent [or] readily discernable on the face of a factually adequate record, [and] also . . . obvious in the sense of not debatable. . . . [T]his inquiry entails a relatively high standard, under which it is not enough for the defendant simply to demonstrate that his position is correct. Rather, the party seeking plain error review must demonstrate that the claimed impropriety was so clear, obvious and indisputable as to warrant the extraordinary remedy of reversal." (Citation omitted; internal quotation marks omitted.) *State*

---

[7] Practice Book § 60-5 provides in relevant part: "The court shall not be bound to consider a claim unless it was distinctly raised at the trial or arose subsequent to the trial. The court may in the interests of justice notice plain error not brought to the attention of the trial court. . . ."

v. *Waters*, 214 Conn. App. 294, 315–16, 280 A.3d 601, cert. denied, 345 Conn. 914, 284 A.3d 25 (2022).

The defendant argues: "The facts of this case do not support the deadly weapon instruction [delivered by the court].[8] First, the inference tends to arise only in a very narrow subset of cases where it is almost incontrovertible. The instruction usually applies when the weapon [used] has the sole purpose of inflicting serious physical injury on someone, such as a firearm. . . . In Connecticut, it is supposed to apply when it is used on the vital part of another. . . .

"Neither of these situations exist[s] in the present case. Although a car is a deadly weapon; see General Statutes § 53a-3 (7); its existence is not premised on its ability to fatally injure someone. Context is critical when a motor vehicle is involved. Here, although the accident was fatal, the facts do not support the inevitable conclusion that [the defendant] was using the car to badly hurt someone. There was no evidence that she chased [Agyei's automobile] down, that she was waging a vendetta against [Agyei] and her son, or even that she was exhibiting road rage, as the state argued." (Citations omitted; footnote added; internal quotation marks

---

[8] The defendant describes the portion of the court's intent instruction at issue, concerning her use of an automobile, as a "deadly weapon" instruction. The court, however, did not refer to the defendant's automobile, let alone any other evidence before the jury in this case, as a deadly weapon.

We note that a "deadly weapon" "means any weapon, whether loaded or unloaded, from which a shot may be discharged, or a switchblade knife, gravity knife, billy, blackjack, bludgeon, or metal knuckles. . . ." General Statutes § 53a-3 (6). An automobile, nevertheless, may be deemed to be a "dangerous instrument," which "means any instrument, article or substance which, under the circumstances in which it is used or attempted or threatened to be used, is capable of causing death or serious physical injury, and includes a 'vehicle' as that term is defined in this section and includes a dog that has been commanded to attack, except a dog owned by a law enforcement agency of the state or any political subdivision thereof or of the federal government when such dog is in the performance of its duties under the direct supervision, care and control of an assigned law enforcement officer . . . ." General Statutes § 53a-3 (7).

omitted.) The defendant argues that the instruction was improper because it "gave the jury permission to find that [she] intended to cause serious physical injury based solely on the facts that [Agyei] died and that [the defendant] was driving a car."

The defendant argues that the error was clear, obvious, and indisputable and that "[e]xpanding the deadly weapon doctrine to an accident such as this one put [her] at a huge disadvantage. It will also affect public confidence in our justice system, as our citizens are all at risk [of] being convicted of manslaughter when such accidents occur."

First, we observe that the defendant focuses on isolated portions of the court's intent instructions, specifically, the portions concerning the defendant's use of an automobile in connection with Agyei's death. She fails to properly view those portions of the instruction in the context of the entire charge. See, e.g., *State* v. *Blaine*, 334 Conn. 298, 308, 221 A.3d 798 (2019) ("individual instructions are not to be judged in artificial isolation from the overall charge" (internal quotation marks omitted)). Here, as we set forth previously, the court instructed the jury to consider "*all of the evidence* as it pertains to the defendant's intent." (Emphasis added.) It also stated that the issue of intent was generally resolved on the basis of circumstantial evidence and "by determining *what the person's conduct was and what the circumstances were surrounding that conduct*, any words spoken by the defendant, and any statements she made." (Emphasis added.) The court cautioned the jury that it "may" infer a particular intent on the part of the defendant if it finds that it is reasonable and logical. The court then stated, "[y]ou *may also consider* the nature of the injuries inflicted upon the decedent, as well as the instrumentality, the motor vehicle, as evidence of intent, and from such evidence an inference may be drawn that there was intent to cause

serious, physical injury. Any inference that may be drawn from the nature of the instrumentality used and the manner of its use is then an inference of fact to be drawn by you *upon consideration of these and other circumstances in the case in accordance with my previous instructions*."

A review of the court's instructions readily reflects that the court did not instruct the jury that it was permissible for it to find that the defendant intended to cause serious physical injury to another based *solely* on the fact that Agyei died and that her death was caused by the defendant's operation of a motor vehicle. Such an interpretation of the charge is unreasonable. Instead, the court's instructions, read broadly and realistically, permitted the jury, in its evaluation of all of the evidence, to consider "the nature of the instrumentality used and the manner of its use" in its evaluation of intent.

Second, the defendant's claim is premised on her erroneous belief that the charge was inapplicable because the evidence was insufficient to support a finding that she intended to cause serious physical injury. This is reflected in her arguments that the collision that caused Agyei's death was "an accident" and that the facts do not support a finding that she was operating her automobile "to badly hurt someone." We have rejected materially similar arguments of this nature in part I of this opinion. The defendant does not appear to cast doubt on the basic principle that, depending on the circumstances of its use, an automobile can be a dangerous instrument that is capable of causing serious physical injury. In light of the evidence presented by the state, the court properly invited the jury to consider the surrounding circumstances of her use of her automobile in the present case to determine whether she intended to cause serious physical injury.

Third, even if we were to conclude that the court's charge was improper, we nevertheless would conclude that the alleged error was neither patent nor readily discernable on the face of the record. The defendant does not argue that the instruction is legally flawed but that it was unwarranted in light of the evidence before the jury. Despite the defendant's characterization of the nature of the claimed error, she has not satisfied the high standard of demonstrating an error that was so clear, obvious and indisputable that it warrants the extraordinary remedy of reversal. In light of the foregoing, we are not persuaded that plain error exists.

The judgment is affirmed.

In this opinion the other judges concurred.